**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KAY JOHNSON, both individually and
derivatively on behalf of NATIONAL
HOLDINGS CORPORATION,

                         Plaintiff,

         v.

NATIONAL SECURITIES
CORPORATION, NATIONAL ASSET
MANAGEMENT, INC., NATIONAL
HOLDINGS CORPORATION,
MICHAEL MULLEN, GLENN
WORMAN, BILLY GROENEVELD,
DANIEL ORTEGA, RENE KAGEFF,
MICHAEL WEISS, NEIL HERSKOWITZ,
MICHAEL SINGER, DANIEL HUME,
JEFFREY GARY, ROBERT FAGENSON,
ATHANASSIOS MICHAS A/K/A
NASSOS MICHAS, BARBARA
CREAGH, and JOHN DOES 1–10,

                        Defendants,

    and

NATIONAL HOLDINGS
CORPORATION,

                      Nominal Defendant.

**Case No.**

**VERIFIED COMPLAINT**

**Jury Trial Demanded**

Plaintiff Kay Johnson, through undersigned counsel, sets forth this Verified Complaint against Defendants National Securities Corporation, National Asset Management, Inc., Michael Mullen, Glenn Worman, Billy Groeneveld, Daniel Ortega, Rene Kageff, Michael Weiss, Neil Herskowitz, Michael Singer, Daniel Hume, Jeffrey Gary, Robert Fagenson, Athanassios Michas a/k/a Nassos Michas, Barbara Creagh, and John Does 1–10, and Nominal Defendant National Holdings Corporation, as follows:

1.      Michael Mullen mucked it up.

2.      Though an investment adviser with little managerial experience in his checkered career, Mullen was hand-picked to run NASDAQ-traded National Holdings Corporation ("National" or the "Company") when Fortress Biotech Inc. ("Fortress") acquired the company in 2016.

3.      Upon acquiring National, Fortress and Mullen immediately put their stamp on the Company, promoting their "Boca Boys" cronies, constructing a "brotherhood" for the male colleagues, conducting "business" at strip clubs, conspiring to eliminate National's most senior women employees, and creating a culture so hostile that the Company settled a woman's sexual harassment claims for $75,000 after she spent less than two days with the Company.

4.      Under Mullen's "leadership," National not only sidelined women employees, but also shifted from customer-focused brokerage services to selling Fortress's private investments and publicly-traded securities.

5.      Throughout his tenure as CEO, Mullen has continued to be the personal investment adviser of Fortress's Chairman / President / CEO Lindsay Rosenwald, and

has continued to manage a National branch created to serve Rosenwald and his associates, reaping 100% of income accrued at that branch: over $3.6 million in 2017 and 2018, ten times his annual base salary for running National.

6.    But Mullen was not content with the millions he "earned" working for Rosenwald and National.

7.    In September 2018, he engaged in insider trading of Fortress subsidiary TG Therapeutics Inc. ("TG Therapeutics")—managed and directed by Defendants Weiss, Hume, and Herskowitz, among others—before it announced disappointing clinical results.

8.    When TG Therapeutics announced those results on September 25, 2018, its stock dropped 44%.

9.    But on a day that TG Therapeutics lost nearly half its value, Defendant Mullen sold put options he had purchased twelve days earlier—and more than doubled his money.

10.    Several of National's directors and officers facilitated and attempted to cover up Mullen's insider trading.

11.    However, National's clearing firm, National Financial Services ("NFS"), noticed Mullen's suspicious trading and asked Ms. Johnson to discreetly investigate it.

12.    Ms. Johnson was Chief Compliance Officer of National's broker–dealer and advisory subsidiaries, the only woman on its eleven-person executive leadership team, and a sixteen-year veteran of National.

13.     But once Ms. Johnson investigated and reported her findings of Mullen's insider trading, he fired her.

14.     Soon thereafter, Ms. Johnson alerted National's directors to Defendant Mullen's violations of the law.

15.     But the directors refused to lift a finger, claiming that her termination merely was the result of an (unplanned, unannounced, improperly-executed) "restructuring."

16.     That, of course, was a lie.

17.     National's directors and officers have demonstrated, time and time again, that their loyalty lies with Fortress and Rosenwald—no matter what that loyalty demands.

18.     Therefore, Ms. Johnson brings this suit.

**The Parties**

19.     Until her March 2019 termination, 55-year-old Plaintiff Kay Johnson was the Executive Vice President, Chief Compliance Officer of Defendant National Securities Corporation and Vice President and a Director of Defendant National Asset Management. She is a resident of Washington state.

20.     Ms. Johnson holds her Financial Industry Regulatory Authority ("FINRA") Series 7, 9, 10, 24, 63, 79, and 99 licenses and was certified as a Regulatory and Compliance Professional by the FINRA Institute at Wharton in 2006.

21.    Ms. Johnson owns 7,189 shares of Defendant National Holdings Corporation, which trades on NASDAQ as "NHLD."[1]

22.    Defendant National Holdings Corporation ("National") is headquartered at 200 Vesey Street, 25th Floor, New York, New York 10281 and is organized under the laws of Delaware.

23.    Through its subsidiaries, National provides full-service retail brokerage services to individual, corporate, and institutional clients; investment banking, merger and acquisition, and advisory services to companies; and trades securities, including exchange-listed stocks.

24.    Defendant National Securities Corporation ("NSC"), Defendant National Asset Management ("NAM"), and non-parties National Insurance Corporation ("NIS"), and National Tax and Financial Services ("NTFS") are wholly-owned subsidiaries of National.

25.    Because NSC is merely an introducing firm, all of National's securities transactions are processed by other entities, including non-party National Financial Services LLC ("NFS"), a clearing firm owned by non-party Fidelity Brokerage Global Brokerage Group, Inc. ("Fidelity").

---

[1] At the time of her wrongful termination, Ms. Johnson held over 100,000 unvested options of National's common stock. These options expired upon her wrongful termination.

26.     Broker-dealer NSC is organized under the laws of Washington State and is a FINRA member firm that now purports to be headquartered at 1200 North Federal Highway, Suite 400, Boca Raton, Florida 33432.

27.     However, as of June 28, 2019, the disclosure documents NSC provides on its website state that it is co-headquartered in New York City and Seattle, where Ms. Johnson worked. See, e.g., Exhibit A, Important Information Disclosure Information and Notices    Regarding    Your    Account,    National    Securities    Corporation, https://www.yournational.com/wp-content/uploads/2019/02/NSC-IIB-2-2019.pdf.

28.     NSC offers securities and variable insurance products.

29.     Defendant NAM is an SEC-registered investment adviser providing asset management advisory services to retail clients for a fee calculated as a percentage of assets managed, and is organized under the laws of Washington state. NAM's most recent Form ADV reports regulatory assets under management of approximately $2.396 billion.

30.     National offers advisory services through NAM.

31.     Non-party Fortress Biotech Inc. ("Fortress") is a biopharmaceutical company that was the majority owner of Defendant National from September 2016 through February 2019.[2]

---

[2] Non-party B. Riley Financial agreed to buy Fortress's majority stake in National for exactly the same price that Fortress paid in 2016: 56.1% of National, or over 7 million shares at $3.25 per share. B. Riley closed the first part of the deal on November 16, 2018, for a 24% stake. After FINRA approved the merger, the parties closed the second stage of the sale on February 11, 2019.

32.    Non-party Lindsay Rosenwald is the Chairman, President, and CEO of Fortress.

33.    Defendant Michael Mullen is the Chairman and CEO of National; President, CEO, and Executive Chairman of NSC; Executive Chairman of NAM; and Executive Chairman of non-parties NIC and NTFS. Upon information and belief, Defendant Mullen is a resident of New Jersey.

34.    All four broker–dealers with which Defendant Mullen was registered before joining National were expelled by FINRA.

35.    Although he has never acquired the FINRA licenses necessary to become a principal of a broker–dealer, Defendant Glenn Worman is the President and Chief Financial Officer of Defendant National and a member of NSC's Executive Committee. Upon information and belief, Defendant Worman is a resident of New Jersey.

36.    Defendant Billy Groeneveld is the Executive Vice President ("EVP") and Chief Risk Management Officer of NSC, Director of Trading of National, and a member of NSC's Executive Committee. Defendant Groeneveld is a resident of Florida.

37.    Two of the three firms with which Mr. Groeneveld was associated before joining National were expelled by FINRA.

38.    Defendant Daniel Ortega is the Managing Director, Chief Supervisory Officer of NSC. Defendant Ortega is a resident of Florida.

39.    Two of the five firms with which Mr. Ortega was associated before joining National were expelled by FINRA.

40.     Defendant Rene Kageff (with Defendants Mullen, Worman, Groeneveld, and Ortega, the "Officer Defendants") is the Regional Supervisory Officer of NSC. Defendant Kageff is a resident of Florida.

41.     Defendants Groeneveld, Ortega, and Kageff are based at NSC's office in Boca Raton, Florida.

42.     Defendant Michael Weiss is the Executive Vice Chairman, Strategic Development of Fortress and the former Chairman of the Board of National. Upon information and belief, he is a resident of New York.

43.     Defendant Weiss is also a director and/or officer of at least six other entities owned, controlled, and / or founded by Mr. Rosenwald, including Fortress subsidiaries TG Therapeutics (CEO, President, and director); Mustang Bio, Inc. ("Mustang") (Executive Chairman); Origo Acquisition Corp., f/k/a CB Pharma Acquisition Corp. ("CB Pharma") (Co-Chairman and officer); Checkpoint Therapeutics, Inc. ("Checkpoint") (director); Avenue Therapeutics, Inc. ("Avenue") (director); and Paramount Capital Asset Management, Inc. subsidiary Genta Inc. DE.

44.     In a 2019 SEC filing, National stated that "[its] Board ha[d] determined that" Mr. Weiss was an "independent director" of National.

45.     Defendant Daniel Hume is a director of National and a member of its Audit, Compensation, and Legal Committees, as well as a director of Fortress subsidiary TG Therapeutics.

46.     Defendant Hume also is a litigation partner of the Manhattan-based law firm Kirby McInerney LLP and is a member of that firm's management committee.

47.    Upon information and belief, Defendant Hume is a resident of New Jersey or New York.

48.    Defendants Weiss and Hume both graduated from Columbia Law School in 1991.

49.    Defendants Weiss and Hume graduated from the State University of New York at Albany in 1984 and 1988, respectively.

50.    In a 2019 SEC filing, National stated that "[its] Board has determined that" Mr. Hume does not "ha[ve] a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director" and is an "independent director" as defined under Rule 5605(a)(2) of the Nasdaq Stock Market, Inc. Marketplace Rules.

51.    Defendant Michael Singer is Chief Strategy Officer of National and a member of NSC's Executive Committee. He is also Executive Vice Chairman of the Board and a member of the Legal Committee. Upon information and belief, he is a resident of New York or New Jersey.

52.    Defendant Jeffrey Gary is a director of National and a member of its Audit Committee. Upon information and belief, he is a resident of New Jersey.

53.    Defendant Barbara Creagh is a director of National and Chief Talent Officer of non-party Greenwich Associates. Upon information and belief, she is a resident of Connecticut.

54.    Defendant Robert Fagenson is Vice Chairman of the Board of National. Upon information and belief, he is a resident of New York.

55.     Defendant Fagenson was Co-Chief Executive Officer of National until January 31, 2017.

56.     Before joining National, Defendant Fagenson had founded and operated a broker–dealer, Fagenson & Co., for 42 years. Fagenson & Co. now operates as a branch of National, and Defendant Fagenson is its principal.

57.     Defendant Athanassios Michas, a/k/a Nassos Michas, is a director of National and a member of its Compensation Committee. Upon information and belief, he is a resident of Massachusetts.

58.     Until February 2019, Defendant Neil Herskowitz was a director of National and a member of its Audit Committee. Upon information and belief, he is a resident of New York.

59.     Defendant Herskowitz also has served as a director of six other companies owned and / or controlled by Rosenwald: Fortress subsidiaries TG Therapeutics, Checkpoint, Avenue, Mustang, and CB Pharma, and Paramount BioCapital, Inc. ("Paramount BioCapital") subsidiary CytRx Oncology Corp. f/k/a Innovive Pharmaceuticals, Inc.

60.     In a 2019 SEC filing, National stated that "[its] Board has determined that" Mr. Herskowitz does not "ha[ve] a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director" and is an "independent director" as defined under Rule 5605(a)(2) of the Nasdaq Stock Market, Inc. Marketplace Rules.

**Jurisdiction and Venue**

61.     Although FINRA members and associated persons generally must arbitrate their disputes, neither employment discrimination nor whistleblower disputes are subject to mandatory arbitration. See FINRA Rules 13200, 13201.

62.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Ms. Johnson alleges violations of federal law, including the Dodd–Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6, 17 C.F.R. § 240.21F-2(b)(2) ("Dodd–Frank"); the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.; and the Equal Pay Act, 29 U.S.C. § 201(d)(1) et seq. ("EPA").

63.     After following the mandated administrative procedures,  Ms. Johnson also will assert claims under the Sarbanes–Oxley Act of 2002, 15 U.S.C. § 7201 et seq. ("Sarbanes–Oxley"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2003 et seq. ("Title VII"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA").

64.     Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental subject-matter jurisdiction over Ms. Johnson's state and local law claims, because those claims are so related to her federal claims that they form part of the same case or controversy.

65.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in this district, because a substantial part of the events or omissions giving rise to this action, including the securities and employment law violations alleged herein, occurred in this district.

66.     This Court has personal jurisdiction over Defendants because the Corporate Defendants are all headquartered in New York and Individual Defendants Weiss, Mullen, and Worman all live and / or work in New York.

67.     This Court also has personal jurisdiction over Defendants because upon information and belief, the nexus of the wrongful activities is New York.

## Administrative Procedures

68.     Ms. Johnson will be filing a complaint with the United States Secretary of Labor as an administrative prerequisite to asserting claims under Sarbanes–Oxley.

69.     Ms. Johnson also will be filing a charge of discrimination with the EEOC as an administrative prerequisite to asserting claims under Title VII and the ADEA.

70.     Thereafter, Ms. Johnson will file an amended complaint including those claims.

71.     A copy of the future amended Complaint will be served on both the Washington State Human Rights Commission and the Seattle Office for Civil Rights, thereby satisfying state and local notice requirements.

## Until Fortress Acquired National, Women Thrived

72.     Ms. Johnson began working on Wall Street in 1986 and immediately was energized by the business.

73.     Fresh out of college, Ms. Johnson began her career as a sales assistant at broker–dealer Shearson Lehman Hutton Inc.

74.     Ms. Johnson then joined broker–dealer Waterhouse Securities, Inc. ("Waterhouse").

75.     Waterhouse promoted Ms. Johnson from a broker to a supervisory position after she acquired her Series 8 license in January 1990.

76.     Prior to having her first child, Ms. Johnson and her spouse moved to Miami, where she held an operations position at broker–dealer Howe, Solomon & Hall, Inc.

77.     Approximately three years later, Ms. Johnson and her family returned home to upstate New York, where she worked as a consultant for a boutique brokerage firm to help it establish compliance procedures and earn its securities licenses.

78.     After having her third child, Ms. Johnson joined broker–dealer Raymond James Financial Services, Inc. and opened a Saratoga Springs branch as its manager.

79.     In 1999, Ms. Johnson and her family moved to Seattle, where she subsequently joined NSC as a compliance officer in 2002.

80.     Non-party Mark Goldwasser was President of National and CEO of NSC and NAM when Ms. Johnson joined the Firm.

81.     Under Mr. Goldwasser—who steered the Firm, headquartered across the street from the World Trade Center, through 9/11 and the Great Recession—National's revenue grew from approximately $40 million to $185 million, and its affiliated investment advisors and registered representatives increased from approximately 200 people to 800 people.

82.     Approximately ten weeks after Ms. Johnson joined the Firm, NSC's then-CCO left NSC.

83.     Although NSC's executive team was based in Manhattan, Mr. Goldwasser promoted Ms. Johnson and asked her to oversee the compliance staff in Seattle and report to NSC's new Manhattan-based Chief Compliance Officer ("CCO").

84.     Approximately one year later, Mr. Goldwasser promoted Ms. Johnson to CCO of NSC.

85.     Ms. Johnson eventually would be both CCO (2003–2019) and an EVP (2017–2019) of NSC; CCO (2014–2018), Vice President ("VP") (2013–2019), and Director (2017–2019) of NAM; and CCO of National subsidiary and broker–dealer vFinance Investments ("vFinance") (2010–2018), which was consolidated into NSC in 2018.

86.     In those roles, Ms. Johnson oversaw all compliance functions, supervised a nationwide staff, and managed regulatory relationships and examinations.

87.     For over fifteen years, Ms. Johnson was NSC's, NAM's, and vFinance's nearly-exclusive contact with securities regulators, including FINRA, the SEC, and the states' authorities.

88.     Under Ms. Johnson's supervision, the compliance departments were responsible for individual and firm registrations and filings, internal audit, regulatory inquiries and exams, annual compliance meetings, and the coordination and communication of compliance initiatives throughout the Firm, including continuing education.

89.     Ms. Johnson was devoted to National for nearly two decades, often working during vacations.

90.     Her dedication did not go unnoticed: she received excellent feedback and reviews throughout her tenure at National.

91.     Indeed, as recently as winter 2019, Defendant Mullen said he would promote Ms. Johnson to CCO of the holding company by the end of 2019.

92.     Ms. Johnson's stellar work was recognized outside the Firm, as well: she has served on a number of FINRA committees, including as a Subject Matter Expert ("SME") on FINRA's Committee on Continuing Education (2003 to present), District Committee Member (three terms), Regulatory Advisory Committee (2016), and Registration and Qualification Subcommittee (2006–2008).

93.     Ms. Johnson also serves as a FINRA Dispute Resolution arbitrator (2002 to present) and has served on FINRA Disciplinary Hearing panels.

94.     Ms. Johnson was just one of the female employees who thrived under Mr. Goldwasser's leadership.

### National is Just the Latest Victim of Fortress's Self-Dealing Schemes

95.     While Mr. Goldwasser's team was attempting to build National's businesses up, Mr. Rosenwald and Defendant Weiss were attempting to acquire it.

96.     Mr. Rosenwald and Defendant Weiss are business partners in a variety of ventures, including Opus Point Partners, LLC ("Opus"), where each is a co-founder and Partner, and Defendant Fortress, which was National's majority shareholder from 2016 to 2018.

97.     In 2006, Mr. Rosenwald founded Fortress under the name Coronado Biosciences, Inc. ("Coronado").

98.     Mr. Rosenwald is Chairman, President, and Chief Executive Officer of Fortress, while Defendant Weiss is Executive Vice Chairman, Strategic Development.

99.    In 1991, Mr. Rosenwald founded Paramount BioCapital, which was a broker–dealer registered with the National Association of Securities Dealers ("NASD") and FINRA[3] until its registration terminated on April 19, 2011.

100.    Paramount BioCapital's business included selling, underwriting, and making private placements of corporate debt securities.

101.    Mr. Rosenwald was an associated person of Paramount BioCapital from 1992 through 2011, while Defendant Weiss was an associated person of Paramount from 1994 through 2001.

102.    Mr. Rosenwald owned over 75% of Paramount BioCapital, which was under common control with other entities, including Opus and several biotechnology companies.

103.    Upon information and belief, Mr. Rosenwald directed the creation of National branch Opus National Private Client Group ("Opus Private")—which Defendant Mullen has managed since its inception—because FINRA was investigating and would soon fine Paramount for violations of NASD rules.

104.    In 2008—less than four months after Opus Private was created—Paramount BioCapital paid a $20,000 fine to FINRA, accepting its allegation that Paramount had been "created and registered as a broker–dealer [ . . . ] to participate in private placements of securities conducted by biotechnology companies founded by Paramount BioSciences, LLC. The founder of Paramount BioSciences, LLC, [Defendant

---

[3] FINRA a self-regulatory organization that is the successor to the NASD and the member regulation, enforcement, and arbitration operations of the New York Stock Exchange.

Rosenwald], is the sole shareholder, chairman, and director of Paramount." See Exhibit B, Letter of Acceptance, Waiver and Consent No. 20070119422, Paramount BioCapital, Inc. (Sept. 24, 2009).

105.   In October 2010—four months before Paramount BioCapital's FINRA registration terminated—Mr. Rosenwald and Defendant Weiss, through Opus, made their first investment in National.

106.   In exchange for the $3 million investment, Opus gained approximately 23% of National's stock; Defendant Weiss became Chairman of National's Board of Directors, effective January 19, 2011; and National and Opus formed a joint venture, OPN Capital Markets ("Opus Capital"), purportedly to provide investment-banking and capital-markets services to biotechnology and life-sciences companies.

107.   Opus Capital did, indeed, provide such services, including to Coronado subsidiary Manhattan Pharmaceuticals, Inc.

108.   Pursuant to Opus Capital's guidance, in April 2012, that company was renamed "TG Therapeutics, Inc." and implemented a 1 for 56.25 reverse stock split.

109.   That same month, Opus Capital was dissolved and Defendant Weiss lost his Board position when another investment group—Defendant Fagenson and non-parties Bryant Riley (owner of B. Riley Financial), Mark Klein, and Starfish Capital LLC—invested $10 million in National.

110.   But Mr. Rosenwald and Defendant Weiss continued to eye National.

111.   In September 2014, Coronado formed CB Pharma "for the purpose of entering into a merger [ . . . ] or similar business combination" with a target business.

112.    CB Pharma closed its initial public offering ("IPO") in December 2014.

113.    Soon thereafter, Opus again invested in National, purchasing 89,530 shares at approximately $4.50 per share.

114.    In April 2015, Coronado Biosciences changed its name to Fortress.

115.    Mr. Rosenwald remained Fortress's Chairman and CEO and Defendant Weiss remained Co-Vice-Chairman and EVP, Strategic Development.

116.    In November 2015, Mr. Rosenwald and Defendant Weiss, as Co-Chairmen of CB Pharma, offered to buy National for $3.25 per share in cash or $3.25 / $3.50 per share in a cash / stock combination.

117.    In other words, Mr. Rosenwald and Defendant Weiss created CB Pharma to buy National; invested in National at $4.50 per share; and, less than a year later, offered to purchase National for nearly 30% less.

118.    Approximately six months later, Fortress and National announced that they had agreed to a tender offer whereby Fortress would offer to purchase up to 100% of National shares at $3.25 per share.

119.    If more than 80% of the National shares were tendered, the companies would merge.

120.    The agreement further provided that regardless of the number of shares purchased, following the closing of the tender offer on September 9, 2016, Fortress would have the right to appoint a majority of the National board.

121.    National's board approved the tender offer agreement, but made no recommendation to shareholders regarding whether to accept the tender offer.

17

122.    Two months later, National announced that Mr. Goldwasser would resign from the Firm the very next day.

**Fortress Immediately Installed its Subordinates as National's Officers and Directors**

123.    Because only approximately 54% of National's shares were tendered, National remained a publicly-traded company upon the tender offer's closing in September 2016.

124.    But pursuant to the agreement's terms, National's board was reduced from ten to seven members; eight members resigned; and five people, all designated by Fortress, were appointed.

125.    The only holdovers were Mr. Goldwasser and Defendant Fagenson.

126.    Meanwhile, Fortress appointed Defendants Herskowitz, Hume, and Weiss, and non-parties Eli Salig and Michael Eustace.

127.    At the time Fortress appointed them to the National board, Defendants Herskowitz, Hume, and Weiss all were officers and / or directors of multiple other Fortress subsidiaries.

128.    By purchasing National, Fortress implemented Paramount BioCapital's former business model, acquiring an "in-house" underwriter and a private sales force of approximately 700 brokers to sell investments in Fortress and its publicly-traded subsidiaries.

129.    Upon information and belief, National brokers have raised over $300 million for Fortress and its subsidiaries since Fortress purchased National.

**The Director Defendants Breached Their Fiduciary Duties When They Entrusted
Defendant Mullen with National**

130.     One of the new, Fortress-controlled Board's first decisions was to elevate
Defendant Mullen to Chairman and CEO of National; Executive Chairman and CEO of
NSC; Executive Chairman of NAM; and Executive Chairman of non-parties National
Insurance Corporation and National Tax and Financial Services, effective January 1, 2017.

131.     Upon information and belief, Mr. Rosenwald and Defendant Weiss hand-
picked Defendant Mullen because they knew they could direct his conduct.

132.     Defendant Mullen was not qualified to be an officer or director of any of
those companies, let alone CEO and Executive Chairman.

133.     In fact, Defendant Mullen had limited, if any, experience managing
securities professionals and no experience managing an independent broker–dealer.

134.     Upon information and belief, until he was appointed National's CEO,
Defendant Mullen had never been responsible for more than a handful of registered
representatives.

135.     Defendant Mullen had, however, been associated with NSC since May 30,
2008, as a manager of one of its branches: Opus Private.

136.     The very same year that FINRA fined Paramount $20,000, Opus Private was
formed to serve Mr. Rosenwald and his associates, including Defendant Weiss.

137.     Indeed, the entity through which Defendant Mullen purports to manage his
branch expenses is named "The Biotech Group LLC" (NY DOS #3927140) and is

19

registered in Staten Island, home of Defendant Mullen and non-parties Messrs. Rosenwald and Daniel Claps, discussed infra.

138.    Defendant Mullen was registered with four securities firms before joining National: D.H. Blair & Co. ("D.H. Blair") from August 1989 through August 1991; A.S. Goldmen & Co., Inc. ("A.S. Goldmen") from August 1991 through May 1994; Joseph Stevens & Company, Inc. ("Joseph Stevens") from April 1994 through April 2006; and GunnAllen Financial, Inc. ("GunnAllen") from April 2006 through June 2008.

139.    Defendant Mullen left all four firms shortly before each was expelled from FINRA membership and ceased to be registered broker–dealers.

140.    Three of the four firms were the subjects of indictments on hundreds of counts of securities fraud, racketeering, and related crimes against the investing public.

141.    In 1987 and 1989, respectively, Mr. Rosenwald and Defendant Mullen each began their securities careers at D.H. Blair, which was founded by Defendant Rosenwald's father-in-law, J. Morton Davis.

142.    In 1992, Mr. Davis gave D.H. Blair to his family, and Mr. Rosenwald left that firm.

143.    In 1998, the NASD expelled D.H. Blair from its membership, after decades of sanctions for violating securities laws and regulations.

144.    For example, in 1997, D.H. Blair and senior personnel were ordered to pay $4.9 million in fines and restitution to over 3,100 retail customers for charging excessive markups in 16 NASDAQ small-cap securities whose IPOs had been underwritten by D.H.

Blair Investment Banking Corp.—another company founded and controlled by Mr. Davis.

145.    NASD noted that as a result of this scheme, "D.H. Blair created an artificial 'profit' in the securities that allowed the preferred customers of one of the firm's senior managers to benefit by selling their stock back to the firm. Thereafter, D.H. Blair's brokers used the artificial increase to solicit new investors to purchase these securities, without disclosing the circumstances of the price increase."

146.    In 2000, a Manhattan grand jury indicted D.H. Blair and 15 of its associated persons on 173 counts of securities fraud and racketeering, alleging that from 1989 to 1998, D.H. Blair executives and stockbrokers ran the firm as a criminal enterprise, victimizing over 50,000 customers.

147.    While Defendant Rosenwald was not indicted, both of his brothers-in-law, who were vice-chairmen of D.H. Blair, pled guilty to multiple counts of fraud and price-fixing and were each ordered to pay restitution of $21 million.

148.    Defendant Mullen's second firm, A.S. Goldmen, also was expelled by securities regulators and found guilty of dozens of felonies.

149.    In 1999, a Manhattan grand jury indicted A.S. Goldmen and 26 of its employees on 240 counts of securities fraud, including market-manipulation, insider trading, falsifying records, and lying to regulators.

150.    The government alleged that A.S. Goldmen brokers targeted retirees and defrauded approximately $100 million from thousands of investors.

151.    The government also alleged that the firm placed warrants in companies being underwritten by A.S. Goldmen in the accounts of dissatisfied investors; by controlling the repurchase and resale of those securities, the firm could drive up their prices.

152.    In 2001, after a six-month trial, a Manhattan jury convicted the firm and four of its officers of enterprise corruption, securities fraud, and criminal possession of stolen property.

153.    The four officers received sentences of five to 30 years and were ordered to pay over $14 million in restitution.

154.    Defendant Mullen worked at the third firm, Joseph Stevens, from April 1994 to April 2006.

155.    Like Paramount BioCapital, Fortress, and (under Defendant Mullen's "leadership") National, Joseph Stevens specialized in marketing small-cap stocks.

156.    Joseph Stevens also was expelled by FINRA, barred by the SEC, and indicted for securities fraud and racketeering.

157.    Prosecutors alleged that the firm was run as a criminal enterprise from January 2001 through December 2005, violating the securities laws all the while, including by hawking stocks based on brokers' ability to earn extra, undisclosed compensation, instead of on the quality and suitability of the investments.

158.    Finally, in 2010, FINRA also shut down Defendant Mullen's last firm, GunnAllen, when it was unable to maintain sufficient net capital after years of fines, complaints, and judgments—and involvement in multiple Ponzi schemes.

159.    In the aftermath, three GunnAllen executives agreed to settle SEC charges that they mishandled customer information in violation of Regulation S–P.

160.    In spring 2008, Defendant Mullen left GunnAllen to establish Opus Private.

161.    Upon information and belief, Rosenwald and / or Weiss directed the creation of Opus Private as essentially a family office for Defendant Rosenwald and his close associates.

162.    Upon information and belief, Rosenwald and / or Weiss installed Defendant Mullen as Opus Private's managing director because they knew he would facilitate their will.

163.    Pursuant to the April 22, 2008 Independent Contractor Agreement between Defendant Mullen and NSC, Defendant Mullen receives 100% of income accrued at the branch before expenses associated with its operation, including commissions owed to its registered representatives.

164.    Furthermore, National's Board approved agreements with Defendants Mullen and Worman and Chief Operating Officer John DeSena that each has "good reason" to terminate his employment if Defendant Mullen is required to report to anyone other than the Board or if Defendant Worman or Mr. DeSena are required to report to anyone other than Defendant Mullen.

165.    Mr. DeSena's employment agreement further provides that he may leave terminate his employment for "good reason" if both Defendants Mullen and Worman are separated from National.

23

**Defendant Mullen is Beholden to No One but Fortress, Rosenwald, and Weiss**

166.    Time and time again, Defendant Mullen's "management" of National has proven that he is unfit.

167.    Although Defendant Mullen became CEO of National in January 2017, he (at least nominally) continues to manage Opus Private, as well.

168.    Opus Private operates on the same premises as National's headquarters.

169.    Despite his other responsibilities as the head of National, NSC, NAM, NIC, and NTFS, Defendant Mullen "earned" $3,624,422 in commissions from Opus Private in 2017 and 2018.

170.    These commissions totaled over ten times his National base salary of $360,000.

171.    Since assuming his CEO and Chairman positions, Defendant Mullen has flouted securities laws and regulations.

172.    In December 2018, Defendants Mullen, Worman, and Groeneveld refused to take any action when Ms. Johnson reported that the Firm's Trading Supervisor provided falsified documents to an internal audit examiner—and the Trading Supervisor admitted doing so to both the auditor and Ms. Johnson.

173.    Defendant Mullen also transformed National into a hostile work environment for women.

174.    At the very first dinner meeting of new management, senior management "dismissed" Ms. Johnson and another female executive and announced that the rest of the group would be going to a strip club.

24

175.    Defendant Mullen also repeatedly invoked the phrase "back-alley coat hanger abortion," among other hideous and misogynistic phrases, to describe business activities, until Defendant Worman finally suggested that such language was inappropriate at work.

176.    Defendant Mullen facilitated sex discrimination by other Opus Private advisers, as well.

177.    For example, in 2019, a woman quit National on her second day on the job after Opus Private advisers sexually harassed her.

178.    National already has settled her sex discrimination claims for approximately $75,000.

179.    Defendant Mullen also sidelined National's nascent women's leadership group.

180.    Defendant Mullen initially expressed empty enthusiasm for the group, but soon thereafter withdrew National's financial, logistical, and marketing support and the opportunity to present to a mixed-gender audience.

181.    Under Defendant Mullen's "leadership," National even eviscerated its maternity leave policy: although it purported to increase maternity benefits to 12 weeks' leave, in practice, National pressured the first employee who took leave under this policy to return to the office within eight weeks.

182.    Since Fortress and Defendant Mullen assumed control at National, National has schemed to replace most of its non-administrative women employees.

183.    Since Fortress and Defendant Mullen assumed control at National, the Company also has pigeonholed senior women into stereotypically "female" positions: human resources, communications, marketing, and support roles.

184.    Even National's website relegates its women executives and director to the bottom of the page:

## Executive Leadership


**MICHAEL A. MULLEN**
Chairman and Chief Executive Officer


**GLENN C. WORMAN**
President and Chief Financial Officer


**JOHN C. DESENA**
Chief Operating Officer


**MICHAEL E. SINGER**
Executive Vice Chairman and Chief Strategy Officer


**FRED N. KNOPF**
General Counsel and Corporate Secretary


**JONATHAN C. RICH**
Executive Vice President, Head of Investment Banking


**DAVID C. LEVINE**
Executive Vice President, National Sales Manager


**THOMAS KOWALCZYK**
Executive Vice President, Co-Head of Investment Solutions



**HENRY E. KAPLAN**

Executive Vice President, Co-Head of Investment Solutions



**WILLIAM GROENEVELD**

Executive Vice President, Chief Risk Management Officer



**DONALD RUNKLE**

Executive Vice President, Chief Regulatory Officer

## Key Department Heads



**ARTHUR R. HOGAN, III**

Managing Director, Chief Market Strategist



**CHAD D. CHAMPION**

Managing Director, Head of Equity Capital Markets



**NATALIA WATSON**

CFO, NHLD subsidiaries



**DEBBIE WALSH**

Managing Director, Head of Human Resources



**SAGIV
SHIV, PH. D.**

Senior Managing Director, Head of
Advisory Services



**KATHRYN TRAVIS**

Senior Managing Director, Tax,
Financial Advisor and Business
Development



**DAN
ORTEGA**

Managing Director, Chief Supervisory
Officer



**HAROLD G.
CHAFFEE, CFA**

Managing Director, Chief Compliance
Officer



**JOHN A.
KOENIGSBERG**

Managing Director, Operations



**KUROSH
GOLCHUBIAN**

Managing Director, Technology



**CHRIS ANN
CAMPANA**

President, Insurance



**MICHAEL T. GILL**

Managing Director, Head of
Recruiting





*Fig. 1: <u>About Us</u>, National Holdings Corporation (June 28, 2019), https://www.yournational.com/about/.*

185.     But because National's officers and directors are loyal to Fortress, Mr. Rosenwald, and Defendant Weiss instead of to National, Defendant Mullen's inexperience and incompetence have not yet hampered his career.

186.     In fact, in June 2018, the Directors gave Defendant Mullen even more power, naming him Chairman of the Board upon Defendant Weiss's June 2018 "retirement" from the Board.

### Despite National's Increasingly-Hostile Environment, Ms. Johnson Remained Crucial to its Success

187.     Despite Defendants' disloyalty and incompetence, Ms. Johnson continued to deliver excellent results for National from its Seattle office.

188.     For sixteen years, Ms. Johnson regularly testified on behalf of National to regulators, in depositions, and at arbitration hearings.

189.     In February 2013, National delegated Ms. Johnson with authority to act on behalf of NAM in SEC-related matters.

190.     To honor her stellar record of defending the Firm, National's General Counsel dubbed Ms. Johnson "The Closer."

191.     Ms. Johnson was so successful that despite National's problems, in August 2018, Reuters published Defendant Mullen's boast that National had not been sanctioned by regulators since 2015.

192.     Until spring 2019, Ms. Johnson spent a considerable amount of time traveling for business at Defendant Mullen's request, including to National's New York headquarters.

193.    In January 2019—just two months before NSC fired her—Ms. Johnson received her largest-ever bonus, which was nearly double the size of her next-largest bonus.

194.    National also issued to Ms. Johnson her largest-ever stock option grant, which never vested, due to National's wrongful termination.

195.    As recently as January 2019, Defendant Worman told Ms. Johnson that National had two people it could not lose: Ms. Johnson and its Head of Operations, non-party John Konigsberg.

196.    Indeed, before Defendant Mullen knew that Ms. Johnson was investigating his unlawful trading activity, he told her that by the end of 2019, he wanted to move her up to the holding company level to oversee the CCOs of National's various regulated entities.

197.    For example, in a January 2018 performance review of Ms. Johnson, Defendant Mullen wrote:

> Kay will NOT retire as Chief Compliance Officer as long as I am around. I told Kay I have a two[-]year plan. She needs to train her heir apparent to replace her as CCO and I will move her upstairs in NSC and NAM. I envision Kay as President, Chief Operating Officer Roles and even beyond. I want to challenge her and task her to help us grow the businesses within the ever[-]changing culture of compliance. Additionally, key roles at [National] will be hers for the taking. [ . . . ] I value Kay as a loyal confidant[e], colleague and a trusted friend. We are a better team with Kay on the team and we are a better team with Kay's contributions.
> (emphasis in original).

198. Yet in March 2019, Defendant Mullen, in a last-minute, private meeting with only Ms. Johnson and Defendant Worman, told Ms. Johnson that NSC and NAM were firing her and her four-person staff.

199. Immediately after Defendant Mullen told Ms. Johnson he was firing her, Defendant Worman said that he had not known of Defendant Mullen's intention until that very morning.

200. Defendant Mullen claimed that he was firing them because National was "restructuring" its compliance department to be based out of its Boca Raton office.

201. But before this meeting, Defendants had never even told Ms. Johnson that they were considering restructuring her department.

202. And despite Defendant Mullen's previously-stated intention, Defendants did not ask Ms. Johnson to train her "heir apparent."

203. Defendants also did not float the possibility of Ms. Johnson continuing to lead compliance.

204. Even though Ms. Johnson frequently traveled for work, Defendants never asked Ms. Johnson whether she was interested in working remotely.

205. Defendants also never asked Ms. Johnson whether she was interested in relocating, for a promotion or otherwise.

206. Defendants did not even solicit Ms. Johnson's input on any possible restructuring or leadership changes within NSC compliance.

207.    And despite Defendant Mullen's written intention to promote Ms. Johnson "upstairs" and to "President, Chief Operating Officer Roles and even beyond," Defendants did not offer her any such position.

208.    Instead, Defendants chose to fire Ms. Johnson, a supposedly invaluable employee, and justified her termination under the guise of a purported "restructure."

209.    Considering Ms. Johnson's 16-year performance for National, this post-facto excuse is preposterous.

210.    In fact, Defendants fired Ms. Johnson **because** she excelled at her work.

211.    In February 2019, Ms. Johnson discovered that Defendant Mullen and other Opus Private advisers and close associates of Defendant Mullen engaged in insider trading of TG Therapeutics.

212.    Defendants fired Ms. Johnson in a futile attempt to bury their misdeeds and prevent her from fulfilling her duty to notify National's regulators.

### Defendant Mullen's TGTX Trading Raised Red Flags

213.    Because NSC is merely an introducing firm that sells products to customers, it is not authorized to maintain custody of customers' assets.

214.    Therefore, NSC must, and does, engage settling, clearing and carrying firms.

215.    NSC's primary clearing firm is non-party NFS, a wholly-owned subsidiary of Fidelity.

216.    In this capacity, NFS issues trade confirmations and monthly statements regarding cash and securities in NSC's customer accounts, which are maintained by NFS.

217.    NFS's responsibilities to its customers and the public include monitoring securities accounts for wrongful activity, and, when necessary, filing Suspicious Activity Reports ("SARs") with the Financial Crimes Enforcement Network ("FinCEN").

218.    FinCEN requires financial institutions to file SARs in a variety of circumstances, including when the institution suspects insider abuse by an employee.

219.    If an institution believes that a SAR-triggering event may have occurred, it must investigate the activity to ensure that any filed SAR contains appropriate, complete, and accurate information.

220.    A SAR must be filed within 30 days of the initial determination of the necessity of filing the report.

221.    In February 2019, NFS risk and AML personnel (collectively, "NFS Risk") asked Ms. Johnson to confidentially investigate suspicious trading in securities of TG Therapeutics by Defendant Mullen (the "Mullen Trades").

222.    In addition to his roles with Fortress and National, Defendant Weiss is Executive Chairman, President, and CEO of Fortress subsidiary TG Therapeutics, which trades on NASDAQ as "TGTX."

223.    Beyond their many professional relationships, Defendant Mullen has a close personal relationship with Defendant Weiss.

224.    Until mid-September 2018, TGTX's management, including Defendant Weiss, had been touting the possibility of filing for accelerated FDA approval of a medical treatment called "U2."

225.    Defendant Mullen acquired shares of TGTX as partial compensation for NSC's representation of TG Therapeutics in an investment banking transaction.

226.    On September 11, 2018, Defendant Mullen's account at NFS (the "Account") was long 76,829 shares of TGTX, which closed at $11.90 per share on that date.

227.    On September 12, 2018, Defendant Mullen opened an option account with NFS, signed an option application, and in that account, purchased 470 put options of TGTX for $114,745.52.

228.    A put option enables its owner to sell a security at a specified price on or before an identified date.

229.    This was the first-ever options trade in the securities account, which Defendant Mullen had opened in 2008.

230.    On September 13, 2018, Defendant Kageff, NSC's Regional Supervisory Officer, approved the trade in the DST Brokerage Solutions ("DST") supervision system.[4]

231.    On September 25, 2018, TGTX announced that independent monitors had been unable to evaluate U2 during a recent interim analysis.

232.    Thus, it became public knowledge that TGTX's filing for accelerated approval of U2 no longer was possible.

---

[4] DST is an automated system of brokerage supervision that, among other actions, flags brokerage transactions that require further supervisory review and authorization.

233.     As a result of the adverse public disclosure, TGTX dropped 44%, closing at $5.15 per share on September 25, 2018.

234.     That same day, Defendant Mullen sold the 470 put options of TGTX he had purchased less than two weeks prior.

235.     In doing so, Defendant Mullen made a profit of over 200% of what he had paid for the puts.

236.     On September 26, 2018, Defendant Kageff reviewed Defendant Mullen's sale of the options and escalated his review to Defendants Ortega and Groeneveld.

237.     Defendant Groeneveld—NSC's Chief Risk Management Officer— purportedly conducted a review, after which he told Defendant Ortega that he had no concerns about the trade.

238.     Defendant Kageff then approved the trade in DST with a note referring to "attached" Bloomberg files and emails.

239.     But there were no attachments to that September 26 DST entry.

**Defendant Mullen's Boys' Club Conspired to Engage in Insider Trading of TGTX**

240.     Defendant Mullen was not the only person who engaged in insider trading of TGTX.

241.     NSC was a market-maker for TGTX.

242.     Upon information and belief, at Fortress's direction, National had aggressively marketed and sold TGTX to NSC's own customers.

243.     In September 2018 alone, NSC's customers bought or sold TGTX common stock 279 times.



*Fig. 2: Number of TGTX transactions per NSC branch per day in September 2018.*

244.    On September 12, 2018—the day that Defendant Mullen purchased the TGTX puts—26 NSC customer accounts sold a total of 53,952 shares of TGTX.

245.    At least 23 of those selling accounts were managed by Defendant Mullen's close friends and branch managers.

246.    21 Opus Private accounts, assigned to Opus Private registered representatives Eric James and / or Vincent D'Albora, sold 38,702 shares of TGTX on September 12.

247.    The final TGTX sale on September 12th was in Mr. D'Albora's own account, which sold 1,451 shares at 3:30pm.

248.    Mr. D'Albora waited two hours to sell his own shares so he would not trigger scrutiny for front-running his customers' sales.

249.    Another two NSC accounts, held by a Jersey City branch of NSC that is managed by Defendant Mullen's close friend Daniel Claps, sold 5,250 shares of TGTX that day.

250.    Between September 13 and 24, Opus Private accounts sold another 152,545 shares of TGTX, including 100,000 shares from a single account on September 17.



*Fig. 3: Number of TGTX sales per NSC branch per day in September 2018.*

251.    But NSC customers who lacked the information obtained by Defendant Mullen's boys' club did not fare so well.

252.    Between September 12 and 24, 2018, 40 NSC customer accounts bought 110,525 shares of TGTX.

253.    On September 24, 2018, Mr. Claps even let three of his own clients buy a total of 1,225 TGTX shares.



*Fig. 4: Number of TGTX purchases per branch per day in September 2018.*

254.    The very next day, TG Therapeutics announced the disappointing clinical results, and TGTX dropped 44%.

255.    That day, 34 NSC customer accounts sold a total of 94,925 shares of TGTX.

256.    These September 25 sales were consistent with the market, as stock-price drops necessarily are caused by the selling of stock.

257.    However, that same day, 28 NSC customer accounts bought 13,747 shares of TGTX.

258.    24 of those 28 customer accounts were managed by Opus Private or Mr. Claps's branch.

259.    Seven of those accounts both sold TGTX on September 12 and bought TGTX on September 25.

**Ms. Johnson Properly Investigated Defendant Mullen's Insider Trading**

260.    Ms. Johnson was unaware of the Mullen Trades until NFS Risk brought them to her attention in February 2019.

261.    NFS Risk requested a call with only Ms. Johnson, specifically requesting that no one else from National be on the call.

262.    NFS Risk explained that the documents "supporting" the Mullen Trades were suspicious and asked Ms. Johnson to investigate the trades.

263.    NFS Risk further requested that Ms. Johnson report back to NFS Risk without Defendant Mullen or others at National becoming aware of the clearing firm's investigation.

264.    That same day, Ms. Johnson and her team reviewed National's paperwork regarding the Mullen Trades, including Defendant Mullen's account history.

265.    Discovering that the September 26 DST alert referenced attachments that appeared not to exist, Ms. Johnson asked her assistant to request copies of the attachments and have them uploaded into the DST system.

266.    Defendant Groeneveld immediately noticed the request and called Ms. Johnson to ask why she was looking into those trades.

267.    Defendant Groeneveld said that he had reviewed the activity and approved it in September, and that he believed it to be appropriate.

268.    Defendant Groeneveld also told Ms. Johnson that he had sent the information to the AML Compliance Officer.

269.    But Defendant Groeneveld lied.

270.    The AML Compliance Officer told Ms. Johnson that neither Defendant Groeneveld nor anyone else had referred the Mullen Trades to her for review to determine if she needed to file a SAR.

271.    The AML Compliance Officer further noted that such referrals are always submitted through a Share Point drive—and that the drive reflected no such activity.

272.    Ms. Johnson then called NSC's General Counsel to inquire whether he knew of the Mullen Trades.

273.    He said that he did not.

274.    During the course of this investigation, Ms. Johnson also learned from the information technology department that it was impossible to limit access to files on the company's share drive—despite the fact that applicable law and regulation require SARs to remain confidential—and that all of National's officers had access to these files.

275.    Consequently, Ms. Johnson directed the AML Compliance Officer to maintain only paper copies of any potentially-sensitive SARs, i.e. those involving officers or directors, and send back-up hard copies to Ms. Johnson for safekeeping, instead of maintaining electronic copies on the Firm's shared system.

**National Buried the Mullen Trades and Ms. Johnson's Investigation**

276.    Ms. Johnson's investigation did not assuage concerns that Defendant Mullen and the other Officer Defendants had violated the securities laws.

277.    FINRA Rule 3110(d)(3)(A) required NSC to report the existence of the internal investigation within ten days of the end of NSC's fiscal quarter on March 31, 2019.

278.    The Firm's FINRA-mandated WSPs placed this requirement specifically on its CCO, Ms. Johnson.

279.    Defendants NSC, NAM, Mullen, and Worman terminated Ms. Johnson's employment even sooner than they did her team's in order to prevent her from reporting the Mullen Trades investigation to FINRA.

280.    Upon information and belief, NSC never reported this internal investigation to FINRA.

281.    FINRA Rule 4530(b) further required that if NSC concludes or reasonably should conclude that NSC or an associated person violated securities laws, it must report such conclusions to FINRA within 30 days.

282.    Upon information and belief, NSC has not made a Rule 4530(b) disclosure of the Mullen Trades to FINRA.

283.    Instead, during a March 7, 2019 review of NSC's WSPs, Defendant Ortega— again, the Managing Director of Supervision, who holds Series 7, 24, and 63 licenses— claimed that he had "never heard of the internal investigation requirements and to [his] knowledge [NSC does not] file them."

284.    Defendant Ortega asked compliance counsel to remove the WSP requiring the Firm to report internal investigations of possible insider trading to FINRA.

285.    Compliance counsel forwarded Defendant Ortega's instruction to remove the insider trading WSP to Ms. Johnson, who correctly responded that NSC could not remove this FINRA-mandated requirement.

**Defendants Fired Ms. Johnson and her Entire Staff Immediately After She Presented Their Finding that Defendant Mullen had Committed Insider Trading**

286.    On Friday, March 8, 2019, Ms. Johnson verbally summarized her team's findings to NFS Risk.

287.    Although the review of Mullen Trades had appeared to have been escalated to the Chief Risk Officer for review, Ms. Johnson and NFS Risk remained concerned for four primary reasons: (1) the uncanny timing of the Mullen Trades; (2) the large size of the option trade, particularly considering that  Defendant Mullen's account had **never** traded options in the decade that it had been open; (3) the conflict of interest between clients' and Defendant Mullen's TGTX trading; and (4) Defendant Mullen's close personal relationship with Defendant Weiss.

288.    Later that week, Defendant Mullen, who is based in New York City, left Ms. Johnson a voicemail, informing her that he would be traveling to Seattle on March 12 and wanted to meet with her.

289.    On March 12, Defendants Mullen and Worman came to Ms. Johnson's office.

290.    Defendant Mullen told Ms. Johnson that he had decided to close the Seattle compliance department and fire all of its employees.

291.    Ms. Johnson's employment was to end no later than March 31—the last day of the quarter.

292.    Mr. Mullen expressly stated that Ms. Johnson, herself, had to be "gone by the end of March."

293.     Conversely, Defendant Mullen did not identify a termination date for Ms. Johnson's four employees, instead stating that they could remain for a "transition period" and leave the company at an unidentified time in May 2019.

294.     Defendant Mullen said that NSC would give Ms. Johnson a "soft landing," but had no further details or paperwork prepared.

295.     Defendant Mullen also said that Defendant Worman had been unaware of Defendant Mullen's decision to fire the Seattle compliance team until that morning.

296.     Defendant Mullen also stated that only Defendants Mullen and Worman and Ms. Johnson were aware of the decision.

297.     Defendant Worman made no substantive remarks during this meeting but confirmed he was not aware of the decision until that very morning.

### Defendants Have Endangered National

298.     The Individual Defendants' reckless behavior is not only designed to evade the securities laws and regulations, but also has damaged and will continue to damage National.

299.     Upon information and belief, Defendants ended Ms. Johnson's employment effective March 31 in order to prevent NSC from complying with its FINRA duties to report (a) the existence of the internal investigation and (b) the Mullen Trades.

300.     Defendants decided to close the Seattle compliance office with no transition plan, leaving just three mid-level compliance employees to cover the entire firm.

301.     Defendants made and executed this decision while NSC had multiple regulatory exams open with the SEC, FINRA, and state regulators.

302.    This decision was particularly harmful to National because Ms. Johnson was the only National employee who had been present for the interviews and knew the facts of National's many open regulatory examinations.

303.    Considering Ms. Johnson's stellar performance and the circumstances under which Defendant Mullen announced NSC's intention to terminate her entire team's employment, it appears that NSC fired these employees to retaliate against the investigation of and to bury the Mullen Trades.

304.    Further, on March 14, Defendant Mullen told Ms. Johnson that he would be promoting Defendant Ortega—the same person who had requested that reporting insider trading be removed from the firm' WSPs—to Chief Supervisory Officer; Harry Chaffee to Chief Compliance Officer of all entities; and Don Runkle from Chief Supervisory Officer to Chief Regulatory Officer.

305.    Given the many management conversations that she has been privy to over the decades, Ms. Johnson was not surprised that all of NSC's choices were men.

306.    Ms. Johnson also was not surprised that Defendants Mullen and Worman promoted Defendant Ortega, as he had interfered with Ms. Johnson's investigation of the Mullen Trades, attempting to have the FINRA-reporting WSP removed.

307.    But Ms. Johnson was shocked by Mr. Chaffee's promotion, as he only recently obtained his Series 7 and 24 licenses and has not held a broker–dealer CCO position in over a decade.

308.    Upon information and belief, Mr. Chaffee's compensation outstrips what NSC and NAM paid Ms. Johnson.

**The Director Defendants Breached Their Duties to National**

309.    The Director Defendants knew and / or consciously disregarded the Officer Defendants' violations of the securities and employment laws.

310.    Upon information and belief, the Director Defendants all serve Fortress, Rosenwald, and Weiss—not National.

311.    Had the Director Defendants been loyal to National and its shareholders, they never would have allowed Defendant Mullen—who had never managed a business line in his life—to be named an executive of any of its subsidiaries, let alone the holding company.

312.    Had the Director Defendants been loyal to National and its shareholders, they never would have approved of his highly unusual, highly favorable compensation package, whereby his "work" as Defendant Rosenwald's stockbroker paid him $3.6 million in two years.

313.    Had the Director Defendants been loyal to National and its shareholders, they never would have elected Defendant Mullen Chairman of the Board.

314.    Had the Director Defendants been loyal to National and its shareholders, they never would have offered new employment contracts to Defendants Mullen and Worman in December 2018.

315.    Had the Director Defendants been loyal to National and its shareholders, they never would have allowed Ms. Johnson and her team to be terminated, let alone while multiple regulatory inquiries were open and unresolved, and with no transition plan at all.

316.     In March 2019, the Director Defendants again proved their disloyalty when they ignored Ms. Johnson's warning that trading records strongly suggested that Defendant Mullen had traded TGTX on material nonpublic information that he received from one of his closest friends, TGTX executive (and former National Chairman) Defendant Weiss.

317.     Even the most expansive interpretation of the business judgment rule would not allow directors to tolerate, let alone facilitate, a public company's CEO committing insider trading using the company's instrumentalities—its employees, relationships, accounts, and clearing firm—particularly where, as here, that insider-trading directly harmed the company's own customers and investors.

### Defendants' Disloyalty has Damaged National

318.     The individual Defendants' misconduct has severely damaged National's reputation, goodwill, competitive and financial positions, exposed National to grave liability from investigations and litigation, endangered its regulatory licenses, and imperiled its future.

319.     Since Fortress assumed control, National continually has underperformed in the stock market.

320.     On April 28, 2016—the day it was announced that Fortress would offer to purchase up to 100% of NHLD at $3.25 per share—NHLD closed at $3.13.

321.     Besides a brief run and spike at $3.72 in winter 2018, NHLD has steadily decreased in value.

322.    The day that <u>Reuters</u> published its exposé, NHLD dropped from $3.38 to $3.20.

323.    NHLD has never recovered, continually decreasing in value ever since, despite the November 2018 announcement that B. Riley would purchase Fortress's National shares at $3.25.

324.    On June 27, 2019, NHLD closed at $2.63.

Market Summary > **National Holdings Corporation**
NASDAQ: NHLD

**2.63** USD −0.12 (4.36%) ↓
Jun 27, 4:00 PM EDT · Disclaimer

| 1 day | 5 days | 1 month | 6 months | YTD | 1 year | 5 years | Max |



| | | | |
|---|---|---|---|
| Open | 2.83 | Div yield | - |
| High | 2.83 | Prev close | 2.75 |
| Low | 2.63 | 52-wk high | 3.70 |
| Mkt cap | 33.93M | 52-wk low | 2.53 |
| P/E ratio | - | | |

325.    The wrongful termination of Ms. Johnson also has damaged National.

326.    Defendants Mullen and Worman terminated Ms. Johnson's employment while multiple significant regulatory investigations were pending, with little understanding or planning of transitioning her team's responsibilities to their replacements.

327.    Upon information and belief, National and its shareholders will be further damaged when this Complaint is filed and Defendants' misconduct is publicly-revealed.

**Ms. Johnson has Standing to Bring Derivative Claims on Behalf of National**

328.    Ms. Johnson brings the Shareholder Claims derivatively in the right and for the benefit of National to redress injuries suffered, and to be suffered, as a direct result of breach of fiduciary duties by Defendants. National is named as a Nominal Defendant solely in a derivative capacity.

329.    Ms. Johnson will adequately and fairly represent the interests of National in enforcing and prosecuting its rights.

330.    Ms. Johnson was a stockholder of National at the time of the alleged wrongdoing, has continuously been a stockholder since that time, and is currently a stockholder of National.

**Demand is Excused**

331.    Ms. Johnson has not made a demand on the Board to pursue this Action because demand would be futile.

332.    The Board of National currently consists of Defendants Singer, Mullen, Hume, Gary, Fagenson, Michas, and Creagh.

333. Defendants Weiss and Herskowitz were directors of National from 2016 through June 2018 and February 2019, respectively.

334. Each of the director Defendants is liable for violating her or his fiduciary duties by rubber-stamping the employment and promotions of unqualified Officer Defendants, acting to conceal the pattern of mismanagement and securities violations by the Officer Defendants, and failing to implement or execute internal controls to ensure that the Board would be informed promptly of any breaches of fiduciary duty or other serious legal, regulatory, and/or ethical violations by National's Officers, particularly given the extensive conflicts posed by the Director Defendants' relationships with Fortress, Rosenwald, and Weiss.

335. Thus, Director Defendants face a substantial likelihood of liability in a manner not shared by the Company and its stockholders.

336. The Director Defendants also are beholden to Fortress, Rosenwald, and Weiss for their lucrative directorships and relationships with other Fortress Entities, and have significant personal and financial ties to them.

337. For example, Defendant Daniel Hume is a Director of National and a member of its Audit, Compensation, and Legal Committees, as well as a director of TG Therapeutics.

338. Defendant Mullen, of course, owes his various officer and director positions in National and its subsidiaries to Fortress, Mr. Rosenwald, and Defendant Weiss.

339. Defendant Herskowitz has served as a Director of six other companies owned and / or controlled by Rosenwald: Fortress subsidiaries TG Therapeutics,

Checkpoint, Avenue, Mustang, and CB Pharma, and Paramount BioCapital subsidiary CytRx Oncology Corp. f/k/a Innovive Pharmaceuticals, Inc.

340.    Defendant Weiss is not only the Executive Vice Chairman, Strategic Development of Fortress and the former Chairman of the Board of National, but also a director and /or officer of at least six other entities owned, controlled, and / or founded by Rosenwald, including Fortress subsidiaries TG Therapeutics (CEO, President, and director); Mustang (Executive Chairman); CB Pharma (Co-Chairman and officer); Checkpoint (director); Avenue (director); and Paramount Capital Asset Management, Inc. subsidiary Genta Inc. DE.

341.    Upon information and belief, the remaining Director Defendants also have significant personal and financial ties to Fortress, Mr. Rosenwald, and Defendant Weiss.

342.    Furthermore, on March 22, 2019, Ms. Johnson reported the Mullen Trades and Officer Defendants' related wrongdoing to the Board.

343.    Ms. Johnson specifically explained Defendant Mullen likely received inside information about TG Therapeutics from Defendant Weiss.

344.    Ms. Johnson also noted that the timing of her termination strongly suggested that Defendants Mullen and Worman intended to terminate her employment with NSC and NAM in order to impede investigations into the Mullen Trades.

345.    Despite retaining legal counsel, the Board did not offer any indication that it would take Ms. Johnson's report of securities and employment law violations seriously, and failed to even offer her an appropriate severance package.

346.    Consequently, and regretfully, Ms. Johnson has filed this suit.

347.    Ms. Johnson also has reported the Mullen Trades to the Securities & Exchange Commission's ("SEC") Office of the Whistleblower.

## CLAIMS

## COUNT I
### Breach of Fiduciary Duty – Defendants Mullen, Worman, Groeneveld, Ortega, and Kageff

348.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

349.    At all relevant times, the Officer Defendants owed fiduciary duties to National, including duties of loyalty, good faith, fair dealing, due care, candor, and oversight in managing and administering National's affairs.

350.    The Officer Defendants knowingly, intentionally, and fraudulently violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, candor, and oversight as a result of the misconduct described above.

351.    The Officer Defendants have duties to National and its stockholders to establish and maintain adequate internal controls to ensure that National was operated in a prudent and lawful manner.

352.    The Officer Defendants have affirmative obligations to maintain an internal control system that uncovers wrongdoing, and to act when informed of wrongdoing.

353.    Moreover, the Officer Defendants have duties to ensure that at all times, National, its officers, and its directors comply with the law.

354.    The Officer Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

355.    The Officer Defendants breached their fiduciary duties to National when they facilitated the insider trading committed by Defendant Mullen and Opus Private.

356.    The Officer Defendants further breached their fiduciary duties when they attempted to bury the insider trading and impede Ms. Johnson's investigation and reporting thereof, including by terminating her employment.

357.    Pre-suit demand is excused because the Board took no action in response to Ms. Johnson's letters informing them that the Officer Defendants had committed and conspired to commit insider trading and terminated her employment in violation of the securities, discrimination, and common laws.

358.    The wrongful termination of Ms. Johnson's employment has already caused National significant harm.

359.    By the wrongful conduct alleged above, the Officer Defendants have caused National significant damages in excess of $15,000, including damage to its stock price and market capitalization, and suffered damage to its corporate image and goodwill.

360.    Damages also include the cost of defending National against government investigations and the penalties, fines, and other liabilities associated with those investigations, including the loss of licenses necessary to operate National's business.

361.    As a result of the misconduct alleged herein, the Officer Defendants are liable to National.

362.    The Officer Defendants' continuing violations of duty should be enjoined.

<u>COUNT II</u>
**Breach of Fiduciary Duty – Defendants Mullen, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, and Creagh**

363.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

364.    Defendants Mullen, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, and Creagh (collectively, the "Director Defendants"[5]) owed fiduciary duties to National, including duties of loyalty, good faith, fair dealing, due care, candor, and oversight in managing and administering National's affairs.

365.    The Director Defendants knowingly, intentionally, and fraudulently violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, candor, and oversight as a result of the misconduct described above.

366.    The Director Defendants have duties to National and its stockholders to establish and maintain adequate internal controls to ensure that National was operated in a prudent and lawful manner.

367.    The Director Defendants have affirmative obligations to maintain an internal control system that uncovers wrongdoing, and to act when informed of wrongdoing.

---

[5] Not all of the Director Defendants were directors of National throughout the relevant time period. On June 12, 2018, Defendant Weiss left the board, and Defendant Michas joined the board. On February 13, 2019, Defendants Creagh and Gary joined the board, and Defendant Herskowitz left the board. Ms. Johnson alleges that each Director Defendant committed acts constituting breaches of the fiduciary duty at the times when each Director Defendant had a fiduciary duty to National.

368.    Moreover, the Director Defendants have duties to ensure that at all times, National, its officers, and its directors comply with the law.

369.    The Director Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.

370.    At all relevant times, the Director Defendants prioritized Fortress, Mr. Rosenwald, and Defendant Weiss over National.

371.    After <u>Reuters</u> published its August 2018 exposé of National's disloyalty, National's stock price immediately dropped.

372.    It did not recover before B. Riley purchased Fortress's interest in National for $3.25 per share—the exact same price that Fortress had paid over two years prior.

373.    If not for Director Defendants' loyalty to Fortress over National and the revelation thereof, National would be worth significantly more than was realized in its sale price to B. Riley.

374.    Although National's stock rose after B. Riley completed its acquisition, the fact that National continues to serve Fortress first—B. Riley lacks the power to appoint Directors or Officers, and thus to effect any change at all—continues to damage National's value.

375.    Pre-suit demand is excused because demand would be futile.

376.    By the wrongful conduct alleged above, the Director Defendants have caused National significant damages in excess of $15,000, including damage to its stock price and market capitalization, and suffered damage to its corporate image and goodwill.

377.    Damages also include the cost of defending National against government investigations and the penalties, fines, and other liabilities associated with those investigations, including the loss of licenses necessary to operate National's business.

378.    As a result of the misconduct alleged herein, the Director Defendants are liable to National.

379.    The Director Defendants' continuing violations of duty should be enjoined.

## COUNT III
**Aiding and Abetting Breach of Fiduciary Duty – Defendants Weiss and Herskowitz**

380.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

381.    At all relevant times, National's officers and directors owed National fiduciary duties of due care, loyalty, and good faith under Delaware law.

382.    These fiduciary duties were well-known to Defendants Weiss and Herskowitz, who also were directors of National until June 2018 and February 2019, respectively.

383.    As alleged herein, the Officer and Director Defendants knowingly and intentionally breached their fiduciary duties to National.

384.    After Defendants Weiss and Herskowitz left the board, each aided and abetted the remaining Officer and Director Defendants' breaches of fiduciary duty.

385.    Upon information and belief, after resigning from the board, Defendants Weiss and Herskowitz not only continued to be apprised of Defendants' misconduct, but, as Fortress loyalists, had the power and ultimate authority to stop their misconduct.

386.    Defendants Weiss and Herskowitz knowingly and intentionally failed to investigate or prevent the Officer and Director Defendants' longstanding mismanagement, including violations of the securities and anti-discrimination laws.

387.    Defendants Weiss's and Herskowitz's knowledge of the Officer and Director Defendants' breaches of fiduciary duties is based in their pervasive conflicts-of-interests—both Weiss and Herskowitz have served on the boards of six other companies owned by Mr. Rosenwald—and their personal witness and facilitation of the Officer and Director Defendants' longstanding mismanagement of National.

388.    National has been harmed by Defendants Weiss's and Herskowitz's aiding and abetting of the Officer and Director Defendants' breaches of fiduciary duty.

389.    By the wrongful conduct alleged above, Defendants Weiss and Herskowitz have caused National significant damages in excess of $15,000, including damage to its stock price and market capitalization, and suffered damage to its corporate image and goodwill.

390.    Damages also include the cost of defending National against government investigations and the penalties, fines, and other liabilities associated with those investigations, including the loss of licenses necessary to operate National's business.

391.    As a result of the misconduct alleged herein, Defendants Weiss and Herskowitz are liable to National.

<u>COUNT IV</u>
**Retaliation in Violation of the Dodd–Frank Act – Defendants NSC, NAM,
Mullen, and Worman**

392.     Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

393.     Dodd–Frank prohibits employers from, <u>inter alia</u>, discharging an employee because she discloses possible illegal activity to the SEC. 15 U.S.C. § 78u-6(h).

394.     Defendants Mullen and Worman terminated Ms. Johnson's employment with Defendants NSC and NAM almost immediately after she concluded her review of the Mullen Trades and presented her findings to NFS.

395.     Defendants Mullen and Worman, acting on behalf of Defendants NSC and NAM, did so in order to punish Ms. Johnson for complying with the securities laws and in anticipation of her reporting those violations to the SEC.

396.     Furthermore, Defendants Mullen and Worman selected a different termination date for Ms. Johnson than for the rest of her team in an attempt to prevent Ms. Johnson from complying with FINRA rules and NSC WSPs that required her to report her findings to FINRA.

397.     In March 2018, Ms. Johnson reported the Mullen Trades, and Defendants' subsequent wrongful activity retaliating against and attempting to interfere with Ms. Johnson's compliance with the securities laws, to the SEC's Office of the Whistleblower.

398.      Defendants NSC, NAM, Mullen, and Worman violated Dodd–Frank's anti-retaliation provisions.

399.    In doing so, NSC, NAM, Mullen, and Worman caused Ms. Johnson damages entitling her to no less $10 million—200% of the minimum cash compensation she would have earned had she retired with National, NSC, and NAM, as promised by Defendant Mullen—and compensation for litigation costs, and expert witness fees, and reasonable attorneys' fees.

**COUNT V**
**Aiding & Abetting Dodd–Frank Retaliation – Defendants National, Groeneveld, Ortega, Kageff, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, Creagh, and John Does 1–10**

400.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

401.    Defendants National, Groeneveld, Ortega, Kageff, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, Creagh, and John Does 1–10 (the "Abettor Defendants") aided and abetted the violations of Dodd–Frank committed by Defendants NSC, NAM, Mullen, and Worman.

402.    Defendants Groeneveld, Ortega, and Kageff not only worked to facilitate and bury Defendant Mullen's insider trading of TGTX, but impeded Ms. Johnson's investigation of the Mullen Trades and, upon information and belief, told Defendants Mullen and Worman that Ms. Johnson was investigating the Mullen Trades.

403.    If not for Defendants Mullen's knowledge of Ms. Johnson's investigation, Ms. Johnson's employment would not have been terminated.

404.    Upon information and belief, Defendant Weiss, who provided the material nonpublic information that caused Defendant Mullen to engage in insider trading,

instructed Defendant Mullen to terminate Ms. Johnson's employment with NSC and NAM.

405.    Furthermore, Defendants Hume, Gary, Fagenson, Michas, and Creagh all aided-and-abetted the wrongful termination by refusing to intercede or take any action after Ms. Johnson informed them of the Mullen Trades and the other illicit activity surrounding Defendant Mullen's and Worman's announcement that her employment would be terminated.

406.    Therefore, the Abettor Defendants violated Dodd–Frank's anti-retaliation provisions.

407.    In doing so, the Abettor Defendants caused Ms. Johnson damages entitling her to no less $10 million—200% of the minimum cash compensation she would have earned had she retired with National, NSC, and NAM, as promised by Defendant Mullen—and compensation for litigation costs, and expert witness fees, and reasonable attorneys' fees

## COUNT VI
### Common-Law Wrongful Termination - Defendants NSC, NAM, Mullen, and Worman

408.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

409.    Washington and New York common law both recognize public-policy exceptions to the at-will employment doctrine, whereby employers may not terminate employees in order to prevent them from complying with the law.

410.    In addition, neither state allows employers to terminate employment in discrimination against age and / or sex.

411.    Ms. Johnson was an at-will employee of Defendants NSC and NAM.

412.    However, Defendants Mullen and Worman caused her NSC and NAM employment to be terminated in order to prevent her from complying with the securities laws.

413.    In addition, and / or in the alternative, Defendants Mullen and Worman terminated Ms. Johnson in discrimination against her age and / or sex.

414.    By wrongfully terminating Ms. Johnson's employment, Defendants NSC, NAM, Mullen, and Worman have damaged her in an amount to be determined at trial, determined to be no less than $5 million.

## COUNT VII
### Civil Conspiracy – Defendants Mullen, Worman, Groeneveld, Ortega, Kageff, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, and Creagh

415.    Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

416.    The termination of Ms. Johnson's employment with NAM and NSC was wrongful.

417.    As alleged above, Defendants Mullen, Worman, Groeneveld, Ortega, Kageff, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, and Creagh all were aware that the decision to terminate Ms. Johnson's employment was wrongful, but they facilitated it anyway.

418.   Defendants Groeneveld, Ortega, and Kageff not only worked to facilitate and bury Defendant Mullen's insider trading of TGTX, but impeded Ms. Johnson's investigation of the Mullen Trades and, upon information and belief, told Defendants Mullen and Worman that Ms. Johnson was investigating the Mullen Trades.

419.   But not for Defendants Mullen's and Worman's knowledge of Ms. Johnson's investigation—conducted discreetly and upon request by NFS—Ms. Johnson's employment would not have been terminated.

420.   Upon information and belief, Defendants Weiss and/or Herskowitz, who provided the material nonpublic information that caused Defendant Mullen to engage in insider trading, instructed Defendant Mullen to terminate Ms. Johnson's employment with NSC and NAM.

421.   Furthermore, Defendants Hume, Gary, Fagenson, Michas, and Creagh all aided-and-abetted the wrongful termination by refusing to intercede or take any action after Ms. Johnson informed them of the Mullen Trades and the other illicit activity surrounding Defendant Mullen's and Worman's announcement that her employment would be terminated.

422.   By conspiring to wrongfully-terminate Ms. Johnson's employment, the Abettor Defendants have damaged her in an amount to be determined at trial, determined to be no less than $5 million.

## COUNT VIII
## Equal Pay Act – NSC and NAM

423.   Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

424.   The Equal Pay Act, 29 U.S.C. § 206(d)(1), prohibits employers from paying employees less on the basis of sex.

425.   NSC and NAM paid Ms. Johnson less than similarly-situated male employees because she is a woman.

426.   Mr. Chaffee is far less qualified for the CCO position than Ms. Johnson ever was.

427.   Upon information and belief, National, NAM, and NSC are compensating Mr. Chaffee at a higher rate (particularly when viewed against his inferior qualifications and fewer responsibilities) than they did Ms. Johnson, because he is male.

428.   By violating the Equal Pay Act, NSC and NAM have damaged Ms. Johnson in an amount to be determined at trial.

### Punitive Damages and Attorneys' Fees

429.   Ms. Johnson repeats and realleges the foregoing paragraphs as if fully set forth herein.

430.   Defendants' conduct is egregious and should shock the conscience of all reasonable people.

431.    To deter others from engaging in similarly conscience-shocking behavior and punish Defendants for their misconduct, Defendants should be held accountable for their blatantly false, intentional, and/or reckless conduct.

432.    Ms. Johnson seeks no less than $20 million in punitive damages, as well as reimbursement of all costs and attorneys' fees incurred herein.

## RELIEF REQUESTED

WHEREFORE, Ms. Johnson requests the following relief:

(i)    A determination that Counts I, II, and III comprise a proper derivative action and that demand on the Director Defendants is excused as futile;

(ii)    A finding that Defendants Mullen, Worman, Groeneveld, Ortega, Kageff, Weiss, Herskowitz, Singer, Hume, Gary, Fagenson, Michas, and Creagh (collectively, the "Individual Defendants") breached their fiduciary duties;

(iii)    An award against all of the Individual Defendants and in favor of National for the amount of all damages sustained by National as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment, including any and all damages compensable by law, as well as disgorgement of all profits, benefits, and other compensation that the Individual Defendants obtained because of the misconduct alleged herein, together with pre-and post-judgment interest, in an amount in excess of $15,000;

(iv)    An order directing the Director Defendants to take necessary actions to enhance National's governance to comply with applicable laws and to protect National, its stockholders, its customers, and its employees from repeating the harms described herein;

(v)    for Count IV, damages in an amount no less than $10 million;

(vi)    for Count V, damages in an amount no less than $10 million;

(vii)    for Count VI, damages in an amount no less than $5 million;

(viii)    for Count VII, damages in an amount no less than $5 million;

(ix)    for Count VIII, damages in an amount to be determined at trial; and

punitive damages in an amount of no less than $20 million; all costs and attorneys' fees; incidental and consequential relief; and all other relief that the Court finds just and proper.

## JURY DEMAND

Ms. Johnson demands a trial by jury.

GUSRAE KAPLAN NUSBAUM PLLC

/s/Ryan Whalen
Ryan Whalen
Kari Parks
120 Wall Street
New York, New York 10005
(212) 269-1400
rwhalen@gusraekaplan.com
kparks@gusraekaplan.com

*Attorneys for Plaintiff Kay Johnson*

Dated: July 3, 2019
       New York, New York

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

KAY JOHNSON, both individually and
derivatively on behalf of NATIONAL
HOLDINGS CORPORATION,

                Plaintiff,

      v.

NATIONAL SECURITIES
CORPORATION, NATIONAL ASSET
MANAGEMENT, INC., NATIONAL
HOLDINGS CORPORATION,
MICHAEL MULLEN, GLENN
WORMAN, BILLY GROENEVELD,
DANIEL ORTEGA, RENE KAGEFF,
MICHAEL WEISS, NEIL HERSKOWITZ,
MICHAEL SINGER, DANIEL HUME,
JEFFREY GARY, ROBERT FAGENSON,
ATHANASSIOS MICHAS A/K/A
NASSOS MICHAS, BARBARA
CREAGH, and JOHN DOES 1–10,

                Defendants,

   and

NATIONAL HOLDINGS
CORPORATION,

           Nominal Defendant.

---

**VERIFICATION OF**
**KAY JOHNSON**

Pursuant to 28 U.S.C. § 1746, I, Kay Johnson, declare as follows:

1.     I am the plaintiff in the above-captioned action.

2.     As stated in the Complaint, I have been a stockholder of National

Holdings Corporation continuously at the time of the fiduciary wrongdoing and

breaches underlying the complaint and will continue to hold National Holdings

Corporation shares at all times relevant to this action.

     3.     I have retained counsel in connection with this litigation.

     4.     I have reviewed the Complaint and I am familiar with the allegations in

the Complaint.

     5.     To the extent that the allegations in the Complaint concern me and events

for which I was present, I know those allegations to be true and correct.

     6.     To the extent that the allegations in the Complaint concern parties other

than me, I believe those allegations to be true and correct.

     I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.

     Executed on July 3, 2019.


                    /s/ Kay Johnson
                    Kay Johnson