**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KAY JOHNSON, both individually and derivatively on behalf of NATIONAL HOLDINGS CORPORATION, | |
| Plaintiff, | |
| v. | No. 19-cv-06197-LTS-OTW |
| NATIONAL SECURITIES CORPORATION, NATIONAL ASSET MANAGEMENT, INC., NATIONAL HOLDINGS CORPORATION, MICHAEL MULLEN, GLENN WORMAN, BILLY GROENEVELD, DANIEL ORTEGA, RENE KAGEFF, MICHAEL SINGER, DANIEL HUME, JEFFREY GARY, ROBERT FAGENSON, ATHANASSIOS MICHAS A/K/A NASSOS MICHAS, BARBARA CREAGH, and JOHN DOES 1-10, | **ORAL ARGUMENT REQUESTED** |
| Defendants | |
| and | |
| NATIONAL HOLDINGS CORPORATION, | |
| Nominal Defendant. | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED VERIFIED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

SUMMARY OF THE ARGUMENT ...................................................................................... 2

ALLEGATIONS OF THE AMENDED COMPLAINT ......................................................... 3

    I.      Relevant Parties and Non-Parties.................................................................................3

    II.    Ms. Johnson's Employment at NSC and NAM and Her Termination .........................4

    III.   Ms. Johnson's Investigation into Mr. Mullen's "Suspicious Trading" .......................4

    IV.   Ms. Johnson's Derivative Claims and Failure to Make Demand on the Board............7

ARGUMENT ........................................................................................................................... 9

    I.      The Court Should Dismiss the Derivative Claims at Count I and II ............................9

        A.     Ms. Johnson Is an Improper Plaintiff Under Rule 23.1 .......................................... 9

        B.     Ms. Johnson's Failure to Make Demand Is Not Excused.....................................12

            1.     Ms. Johnson Has Not Adequately Alleged That a Majority of the Board
                 Faces a Substantial Likelihood of Personal Liability .................................... 15

            2.     Ms. Johnson Has Not Adequately Alleged That a Majority of The Directors
                 Lack Independence ........................................................................................ 22

    II.    The Court Should Dismiss In Full the Retaliation Claims at Counts III-VI
        and Count VIII ..........................................................................................................25

        A.     Legal Standard ...................................................................................................... 25

        B.     The Court Should Dismiss Count III Because Ms. Johnson Fails to Allege Facts
            Sufficient to Set Forth a *Prima Facie* Case of Retaliation Under the Sarbanes-
            Oxley Act .............................................................................................................. 26

            1.     Ms. Johnson Fails to Plead that She Engaged in Protected Activity .............. 26

            2.     Ms. Johnson Fails to Plead that Her Employer Knew She Engaged in
                 Protected Activity .......................................................................................... 28

        C.     The Court Should Dismiss Count IV Because Ms. Johnson Is Not a
            "Whistleblower" Under Dodd-Frank's Anti-Retaliation Provision..................... 30

        D.     The Court Should Dismiss Counts V and VI Because Ms. Johnson Cannot State a
            Claim for Aiding and Abetting Retaliation Under the Dodd-Frank Act or the
            Sarbanes-Oxley Act .............................................................................................. 32

            1.     Ms. Johnson's Inability to Maintain an Underlying Cause of Action for
                 Retaliation under the Dodd-Frank Act or the Sarbanes-Oxley Act Precludes
                 Her from Maintaining Aiding and Abetting Claims Under Such Laws ......... 32

            2.     Even if Ms. Johnson Could Maintain Her Underlying Causes of Action Under
                 the Anti-Retaliation Provisions, the Court Should Still Dismiss Counts V and
                 VI Because No Cause of Action for Aiding and Abetting the Anti-Retaliation
                 Provisions Exists........................................................................................... 33

      3.      Even if Aiding and Abetting Causes of Action Existed Under the Anti-Retaliation Provisions, Counts V and VI Would Still Be Subject to Dismissal Because Ms. Johnson Failed to Plead Substantial Assistance ........................ 33

      4.      In No Event Can Ms. Johnson Maintain Claims Under the Sarbanes-Oxley Act Against the Named Directors or John Does 1-10 .................................... 36

      5.      In No Event Can Ms. Johnson Maintain Claims Against Defendants Groeneveld, Ortega, Kageff, or Singer Under the Sarbanes-Oxley Act or the Dodd-Frank Act Because Each Lacks the Functional Ability to Retaliate Against Her ................................................................................................. 37

  E.     The Court Should Dismiss Count VIII Because New York Does Not Recognize a Claim for Civil Conspiracy and Ms. Johnson Failed to Plead a Necessary Element of a Civil Conspiracy Claim Under Washington Law ........................... 38

      1.      New York Does Not Recognize Civil Conspiracy as an Independent Cause of Action ............................................................................................. 38

      2.      Ms. Johnson Failed to Plead a Necessary Element of a Civil Conspiracy Claim Under Washington Law ...................................................................... 38

CONCLUSION ..................................................................................................................... 39

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Andrews v. ING North Amerca Inc. Corp.*,
  ALJ Case Nos. 2005-SOX-50, 2005-SOX- 51 (ALJ Jan. 8, 2009) ..................................27

*Arnold v. Society for Savings Bancorp, Inc.*,
  650 A.2d 1270 (Del. 1994) .......................................................................................20

*Aronson v. Lewis*,
  473 A.2d 805 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ........................................................................... *passim*

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................................25

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*,
  845 A.2d 1040 (Del. 2004) ..........................................................................14, 23, 24, 25

*Bechtel v. Administrative Review Board, U.S. Department of Labor*,
  710 F.3d 443 (2d Cir. 2013)......................................................................................26

*Berwick v. New Work Network Int'l, Ltd.*,
  2007 WL 949767 (S.D.N.Y. Mar. 28, 2007) ...................................................38

*Biosafe-One, Inc. v. Hawks*,
  639 F. Supp. 2d 358 (S.D.N.Y. 2009)..........................................................................38

*Blum v. Morgan Guaranty Trust Co.*,
  539 F.2d 1388 (5th Cir. 1976) .......................................................................12

*Bolton v. Gramlich*,
  540 F. Supp. 822 (S.D.N.Y. 1982) ................................................................10

*Boyd v. Accuray, Inc.*,
  873 F. Supp. 2d 1156 (N.D. Cal. 2012), *aff'd*, 593 F. App'x 647 (9th Cir. 2015) ...........29

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ......................................................................13, 22

*Brickman v. Tyco Toys, Inc.*,
  731 F. Supp. 101 (S.D.N.Y. 1990) ................................................................10

*Brody v. Chemical Bank*,
  482 F.2d 1111 (2d Cir. 1973)........................................................................13

*Bury v. Force Protection, Inc.*,
    2011 WL 2935916 (D.S.C. June 27, 2011) ................................................................... 37

*Byington v. Vega Biotechnologies, Inc.*,
    869 F. Supp. 338 (D. Md. 1994) ................................................................................... 20

*Central Bank of Denver, N.A. v. First Interstate Bank*,
    511 U.S. 164 (1994) ...................................................................................................... 33

*Chrystall v. Serden Technologies*,
    913 F. Supp. 2d 1341 (S.D. Fla. 2012) ......................................................................... 24

*Digital Realty Trust, Inc. v. Somers*,
    138 S. Ct. 757 (2018) .............................................................................................. 30, 31

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011) .......................................................................... 32

*Fink v. Weill*,
    2005 WL 2298224 (S.D.N.Y. Sept. 19, 2005) ............................................................. 13

*Fraser v. Fiduciary Trust Co. Int'l*,
    2005 U.S. Dist. LEXIS 48059 (S.D.N.Y. June 23, 2005), *aff'd*, 396 F. App'x 734
    (2d Cir. 2010) ................................................................................................................ 28

*Frederickson v. Home Depot USA, Inc.*,
    2010 DOL Ad. Rev. Bd. LEXIS 77 (Dep't of Labor May 27, 2010) ............................ 29

*Friedman v. Dolan*,
    2015 WL 4040806 (Del. Ch. June 30, 2015) ............................................................... 24

*Friedman v. Khosrowshahi*,
    2014 WL 3519188 (Del. Ch. July 16, 2014), *aff'd*, 2015 WL 1001009
    (Del. Mar. 6, 2015) ....................................................................................................... 15

*G.A. Enterprises, Inc. v. Leisure Living Communities, Inc.*,
    517 F.2d 24 (1st Cir. 1975) .......................................................................................... 11

*Guttman v. Huang*,
    823 A.2d 492 (Del. Ch. 2003) ....................................................................... 14, 16, 19, 20

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ...................................................................................... 26, 30

*In re Alloy, Inc.*,
    2011 WL 4863716 (Del. Ch. Oct. 13, 2011) ............................................................... 16

*In re Bank of America Corp. Securities, Derivative & ERISA Litigation*,
   2010 WL 5248815 (S.D.N.Y. Dec. 14, 2010) ...........................................................9, 11

*In re Baxter Int'l, Inc. Shareholders Litigation*,
   654 A.2d 1268 (Del. Ch. 1995)...........................................................................16

*In re Bayou Hedge Funds Investment Litigation*,
   472 F. Supp. 2d 528 (S.D.N.Y. 2007)..................................................................34

*In re Caremark Int'l Inc. Derivative Litigation*,
   698 A.2d 959 (Del. Ch. 1996)..............................................................................19

*In re Citigroup Inc. Shareholder Derivative Litigation*,
   964 A.2d 106 (Del. Ch. 2009)..............................................................................19

*In re CNET Networks, Inc. Shareholder Derivative Litigation*,
   483 F. Supp. 2d 947 (N.D. Cal. 2007) .................................................................19

*In re Cornerstone Therapeutics, Inc. Shareholder Litigation*,
   115 A.3d 1173 (Del. 2015) ..................................................................................14

*In re Dow Chemical Co. Derivative Litigation*,
   2010 WL 66769 (Del. Ch. Jan. 11, 2010).............................................................22

*In re Goldman Sachs Group, Inc. Shareholder Litigation*,
   2011 WL 4826104 (Del. Ch. Oct. 12, 2011) ........................................................15

*In re IAC/InterActiveCorp Securities Litigation*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007)..................................................................22

*In re INFOUSA, Inc. Shareholder Litigation*,
   953 A.2d 963 (Del. Ch. 2007)..............................................................................14

*In re Sagent Technology, Inc. Derivative Litigation*,
   278 F. Supp. 2d 1079 (N.D. Cal. 2003) ...............................................................24

*In re Walt Disney Co. Derivative Litigation*,
   825 A.2d 275 (Del. Ch. 2003)..............................................................................18

*In re Western National Corp. Shareholders Litigation*,
   2000 WL 710192 (Del. Ch. May 22, 2000)......................................................23, 25

*Innovative Therapies, Inc. v. Meents*,
   2013 WL 2919983 (D. Md. June 12, 2013)...........................................................24

*JFURTI, LLC v. Singal*,
   2018 WL 6332907 (S.D.N.Y. Nov. 12, 2018)................................................9, 10, 12, 13

*Jordan v. Sprint Nextel Corp.*,
    3 F. Supp. 3d 917 (D. Kan. 2014) ....................................................................37

*Kamen v. Kemper Financial Services, Inc.*,
    500 U.S. 90 (1991) ..........................................................................................13

*Kantin v. Metropolitan Life Insurance Co.*,
    2016 WL 1020988 (S.D.N.Y. Mar. 14, 2016), *aff'd in part*, 696 F. App'x 527
    (2d Cir. 2017) ..................................................................................................28

*Khanna v. McMinn*,
    2006 WL 1388744 (Del. Ch. May 9, 2006) ....................................................12

*King v. Baldino*,
    648 F. Supp. 2d 609 (D. Del. 2009) ................................................................24

*Kinojuz I.P. v. IRP Int'l Inc.*,
    2016 WL 5936875 (E.D.N.Y. Oct. 12, 2016) .................................................38

*Kittay v. Atlantic Bank (In re Global Service Group LLC)*,
    316 B.R. 451 (Bankr. S.D.N.Y. 2004) ...........................................................32

*Klopfenstein v. PCC Flow Technologies Holdings, Inc.*,
    2009 WL 2844805 (Dep't of Labor Aug. 31, 2009) ......................................37

*Krys v. Sugrue (In re Refco Inc.)*,
    2011 U.S. Dist. LEXIS 142291 (S.D.N.Y. Dec. 8, 2011) ..........................34, 35

*Lewis v. Graces*,
    701 F.2d 245 (2d Cir. 1983), *abrogated on other grounds by Espinoza ex*
    *rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015) ..............19

*Louisiana Municipal Police Employees Retirement System v. Pandit*,
    2009 WL 2902587 (S.D.N.Y. Sept. 10, 2009) ................................................19

*Malpiede v. Townson*,
    780 A.2d 1075 (Del. 2001) .............................................................................15

*MCG Capital Corp. v. Maginn*,
    2010 WL 1782271 (Del. Ch. May 5, 2010) ................................................15, 24

*Nigerian National Petroleum Corp. v. Citibank, N.A.*,
    1999 WL 558141 (S.D.N.Y. July 30, 1999) ..............................................34, 35

*Orman v. Cullman*,
    794 A.2d 5 (Del. Ch. 2002) .............................................................................24

*Papilsky v. Berndt*,
    466 F.2d 251 (2d Cir. 1972)............................................................10

*Park Employees' & Retirement Board Employees' Annuity & Benefit Fund v. Smith*,
    2017 WL 1382597 (Del. Ch. Apr. 18, 2017) ....................................23

*Petersen v. Federated Development Co.*,
    416 F. Supp. 466 (S.D.N.Y. 1976) ...................................................10

*Priestley v. Comrie*,
    2007 WL 4208592 (S.D.N.Y. Nov. 27, 2017) ..............................9, 12

*Prime Mover Partners L.P. v. Elixir Gaming Technologies, Inc.*,
    898 F. Supp. 2d 673 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013)................12

*Rales v. Blasband*,
    634 A.2d 927 (Del. 1993) ..................................................13, 14, 20

*Recchion ex rel. Westinghouse Electric Corp. v. Kirby*,
    637 F. Supp. 1309 (W.D. Pa. 1986)..................................................12

*Riddle v. First Tennessee Bank*,
    2011 WL 4348298 (M.D. Tenn. Sept. 16, 2011)*, aff'd*, 497 F. App'x 588
    (6th Cir. 2012)................................................................................27

*Ritchie Capital Management, L.L.C. v. General Electric Capital Corp.*,
    121 F. Supp. 3d 321 (S.D.N.Y. 2015)..........................................34, 35

*Rollins v. Goldman Sachs & Co. LLC*,
    2019 WL 2754635 (S.D.N.Y. July 2, 2019) ....................................31

*Ryan v. Aetna Life Insurance Co.*,
    765 F. Supp. 133 (S.D.N.Y. 1991) ................................................9, 10

*St. Clair Shores General Employees Retirement System v. Eibeler*,
    2006 WL 2849783 (S.D.N.Y. Oct. 4, 2006)....................................10

*Stone ex rel. AmSouth Bancorp. v. Ritter*,
    911 A.2d 362 (Del. 2006) ................................................................19

*Tatintsian v. Vorotynstev*,
    2018 WL 2324998 (S.D.N.Y. May 22, 2018) ..................................10

*Teamsters Union 25 Health Services & Insurance Plan v. Baiera*,
    119 A.3d 44 (Del. Ch. 2015)............................................................14

*Tellez v. OTG Interactive, LLC*,
    2019 WL 2343202 (S.D.N.Y. June 3, 2019) ....................................32

*Tuscano v. Tuscano*,
    403 F. Supp. 2d 214 (E.D.N.Y. 2005) ...................................................................10

*Webster v. Webster*,
    2012 WL 628228 (Wash. Ct. App. Feb. 28, 2012) ...............................................39

*Wiest v. Lynch*,
    15 F. Supp. 3d 543 (E.D. Pa. 2014) .....................................................................29

*Woody v. Stapp*,
    189 P.3d 807 (Wash. Ct. App. 2008) ....................................................................38

*Zornoza v. Terraform Global, Inc.*,
    2019 WL 6701875 (S.D.N.Y. Dec. 9. 2019) .........................................................36

## STATUTES, RULES, AND REGULATIONS

29 C.F.R. § 1980.104(e)(2) ..............................................................................................26

8 Del. C. § 102(b)(7) .......................................................................................................15

15 U.S.C. § 78u-6(h) ........................................................................................................30

18 U.S.C. § 1514A ...........................................................................................26, 27, 28, 36

Del. Gen. Corp. Law § 141(e) .........................................................................................20

Fed. R. Civ. P. 12(b)(6) ...................................................................................................25

Fed. R. Civ. P. 23.1 .................................................................................................9, 10, 12

## OTHER AUTHORITIES

Amended & Restated Certificate of Incorporation of National Holdings Corporation
    (Feb. 1, 2017) ........................................................................................................15

Ralph C. Ferrara et al., Shareholder Derivative Litigation: Besieging the Board (2005) ..............14

## PRELIMINARY STATEMENT

This is a far-reaching and meritless action brought by a disgruntled former employee who lost her job as part of a corporate restructuring that moved her department across the country. Instead of accepting this fact, Plaintiff Kay Johnson concocted a theory—unsupported by any facts but full of salacious conjecture—that her employment was terminated because Mr. Mullen found out that she had undertaken an investigation into supposedly "suspicious trading" involving Mr. Mullen that had taken place the previous year. But an unsupported theory of retaliation is, as detailed below, legally insufficient to withstand a motion to dismiss. The law requires a plaintiff to do more to maintain a cause of action than rely on character assassination and unfounded speculation.

As if Ms. Johnson's baseless theory of retaliation were not enough, she serves up an entirely different (yet equally inaccurate) sinister theory of her termination: that she was the victim of age and sex discrimination. And there is still more. Despite her obvious antipathy for National, Ms. Johnson—without making a demand on the Board—purports to assert not only direct claims *against* National but also, in the very same pleading, derivative claims *on behalf of* National, suggesting that National itself somehow was the victim of the same conduct that she alleges the company perpetrated on her. But Ms. Johnson offers nothing excusing her failure to make demand beyond unsupported insinuations about the Board's supposed liability for failure to save her employment, and fact-free conclusions about directors being beholden to Mr. Mullen and the company's *former* controlling shareholder—which even if true has no relevance whatever to the demand futility inquiry.

In short, the Amended Complaint consists of little beyond inflammatory rhetoric and inconsistent and unfounded accusations. Unsurprisingly, for the reasons set out below, the majority of Ms. Johnson's counts fail to state a claim.

1

## SUMMARY OF THE ARGUMENT

The Amended Complaint should be dismissed with respect to the majority of the direct claims and both derivative claims.  *First*, this action is nothing more than an attempt by a disgruntled former employee to damage National's reputation and seek revenge for losing her job as part of a corporate downsizing.  As detailed below, there is no factual basis for her suggestion of a retaliatory termination: Ms. Johnson cannot make out a *prima facie* case for retaliation under the Sarbanes-Oxley Act or wedge herself into the definition of a "whistleblower" under the Dodd-Frank Act, and Counts III and IV must therefore be dismissed.  As a result, the aiding and abetting claims at Counts V and VI must also fail.  Further, as explained below, the state-law-based Count VIII claim is deficient under both New York and Washington laws.[1]

*Second*, Ms. Johnson should be barred from bringing her direct and derivative claims in one action.  Courts in this Circuit have found that plaintiffs like Ms. Johnson cannot bring both types of claims simultaneously because it creates an impermissible conflict of interest.  That conflict of interest is readily apparent here, where Ms. Johnson's principal objective is to recover money for herself *against* National, not act for the benefit of National; and where she would need to choose between irreconcilable objectives, proving that National is the perpetrator and the victim of the same alleged misconduct.

*Finally*, even if Ms. Johnson could adequately represent National in a derivative suit, her derivative claims must fail because she does not plead with the requisite particularity an excuse

---

[1] Because counsel for Ms. Johnson advised Defendants' counsel on March 17, 2020 that Ms. Johnson no longer plans to pursue the Count VII claim for common-law wrongful termination to the extent it attempts to set forth a cause of action under New York law, Defendants are not seeking dismissal of this Count.  However, Defendants reserve the right to seek dismissal of this Count if Ms. Johnson changes her stated position upon which Defendants have relied.

for her failure to make demand on the Board.  The Amended Complaint fails utterly to plead that a Board majority faces a substantial risk of personal liability for the employment decisions at issue, or for failure to exercise oversight responsibility.  Similarly, the Amended Complaint is devoid of any non-conclusory allegations indicating that any Director (much less a majority) is beholden to Mr. Mullen, or that any disabling connection exists between any Director and Dr. Rosenwald or Mr. Weiss (if it was even relevant, which it is not) such that the Director would rather breach his or her duties than risk that relationship.  As a result, Counts I and II also must be dismissed.

## ALLEGATIONS OF THE AMENDED COMPLAINT

### I.     Relevant Parties and Non-Parties

National Holdings Corporation ("National") is a Delaware corporation headquartered in New York City, which provides a wide range of brokerage, investment banking, and advisory services to individual, corporate, and institutional clients.  Am. Compl. ¶ 23.[2]  Mr. Mullen is its Chairman and CEO and has served in this position since January 1, 2017.  *Id.* ¶¶ 34, 131.  Many of National's services are provided through wholly owned subsidiaries National Securities Corporation ("NSC"), a broker-dealer, and National Asset Management, Inc. ("NAM"), an SEC-registered investment advisor, both of which are organized under the laws of Washington state.  *Id.* ¶¶ 24, 26, 29.  National Financial Services ("NFS"), a clearing firm that Fidelity Brokerage Global Brokerage Group, Inc. owns, processes National's securities transactions.  *Id.* ¶¶ 11, 25.

Since 2010, non-party Dr. Lindsay Rosenwald and non-party Michael Weiss have, through various entities, invested in National several times.  Am. Compl. ¶¶ 105-06, 117-27.

---

[2]  Capitalized terms used but not defined herein shall have the meanings given to them in the Amended Complaint. Defendants recite the allegations of the Amended Complaint, which must be taken as true for purpose of this Motion, but do not concede that the allegations are factually accurate.

Most recently, biopharmaceutical company Fortress Biotech, Inc. ("Fortress"), at which Dr.
Rosenwald and Mr. Weiss hold executive positions, owned a 56.1% stake in National from
September 2016 through February 2019.  *Id.* ¶ 32 & n.4.  Mr. Weiss also served on National's
Board between 2010 and 2012, and again from 2016 to 2018.  *Id.* ¶¶ 106, 110, 127, 193.[3]

## II.  Ms. Johnson's Employment at NSC and NAM and Her Termination

Ms. Johnson began working for NSC as a compliance officer in 2002.  Am. Compl. ¶ 79.
She was repeatedly promoted, including by Mr. Mullen, and ultimately held—during Mr.
Mullen's tenure as CEO—the positions of Executive Vice President and Chief Compliance
Officer at NSC and Vice President and a director of NAM.  *Id.* ¶¶ 19, 85.  Ms. Johnson resides in
Washington, *id.* ¶ 19, and worked for NSC from its Seattle office, *id.* ¶¶ 27, 83.

On March 12, 2019, Mr. Mullen, along with Mr. Worman, flew to Seattle where Mr.
Mullen advised Ms. Johnson that he was terminating her employment as well as the employment
of her four-person compliance team based in Seattle, because National was restructuring the
compliance department to be based out of its Boca Raton office.  Am. Compl. ¶¶ 205, 207, 294-
95.  Ms. Johnson does not dispute that NSC has moved its headquarters to Boca Raton following
her termination from employment.  *See id.* ¶¶ 26, 42.

## III.  Ms. Johnson's Investigation into Mr. Mullen's "Suspicious Trading"

As NSC's primary clearing firm, NSC tasks NFS to issue trade confirmations and
monthly statements, as well as to monitor securities accounts for wrongful activity.  Am. Compl.
¶¶ 223-24.  Ms. Johnson alleges that in February 2019, she was asked by NFS Risk to
"discreetly" and "confidentially investigate suspicious trading in securities of TG Therapeutics

---

[3] In a gratuitous attempt at guilt by association, Ms. Johnson alleges that Mr. Rosenwald's two brothers-in-law "pled guilty to multiple counts of fraud and price-fixing."  Am. Compl. ¶ 148.

[("TGTX")] by Defendant Mullen" (the "Mullen Trades") that had taken place seven months earlier, in September 2018. *Id.* ¶¶ 11, 228.

In fall 2018, TGTX indicated to the investor community that it would seek accelerated FDA approval of a medical treatment called U2. Am. Compl. ¶ 229. On September 12, 2018, Mr. Mullen, who had owned TGTX stock in an NFS account for several years, purchased 470 put options in TGTX. *Id.* ¶¶ 231-34. A few weeks later, on September 25, 2018, TGTX announced that it could no longer file for accelerated FDA approval of U2. *Id.* ¶ 238. The price of TGTX shares then dropped, and Mr. Mullen exercised his put options. *Id.* ¶ 241. Ms. Johnson does not allege in the Amended Complaint whether the profit from the put options was enough to outweigh Mr. Mullen's sharp losses on his TGTX stock, which he continued to hold. Nor does Ms. Johnson allege anywhere in the Amended Complaint that the Mullen Trades were illegal or that Mr. Mullen actually traded on material nonpublic information. She ultimately states only that the "trading records strongly suggested" that Mr. Mullen had traded TGTX on material nonpublic information, *see id.* ¶ 325, and that the trades were therefore "suspicious," *e.g.*, *id.* ¶ 7.[4]

Notably, however, Ms. Johnson does not allege that she advised anyone at NAM, NSC or National (including National's directors)—*before being advised of her termination from employment*—that she believed the Mullen Trades were in any way suspicious. To the contrary, Ms. Johnson states that NFS Risk asked her "confidentially" and "discreetly" to *investigate* suspicious trading, Am. Compl. ¶¶ 11, 228, 269, and nowhere does she plead that she broke that confidentiality or told anyone, before she was advised of her termination, that she believed the

---

[4] In keeping with the inflammatory tone of the Amended Complaint, Ms. Johnson also accuses other members of Mr. Mullen's 'boys' club" of "conspire[ing]" to engage in suspicious trading of TGTX. *See* Am. Compl. at p. 38, ¶ 3.

Mullen Trades were in any way "suspicious."  Only after Ms. Johnson had been advised of her termination does she allege that she "informed [the named Defendant directors] of the Mullen Trades and the other illicit activity surrounding Defendants Mullen's and Worman's announcement that her employment would be terminated."  *Id.* ¶¶ 406, 413, 429.

As Ms. Johnson acknowledges, the Mullen Trades were subject to several levels of internal review both when they were effectuated and after TGTX's September 25 announcement. Rene Kageff, the Regional Supervisory Officer of NSC, approved Mr. Mullen's purchase of the TGTX put options on September 13, 2018.  Am. Compl. ¶ 236.  Moreover, on September 26, 2018, Mr. Kageff reviewed the sale of those put options and escalated his review to Billy Groeneveld, Chief Risk Management Officer of NSC, who in turn conducted a review and told NSC's Chief Supervisory Officer Daniel Ortega that "he had no concerns about the trade."  *Id.* ¶¶ 242-45.  These reviews were logged in the brokerage supervision system called DST.  *Id.* ¶¶ 236, 244.

In February 2019, after NFS Risk asked Ms. Johnson to investigate the Mullen Trades, Am. Compl. ¶¶ 266-69, Ms. Johnson spoke to three employees to gather facts about the Mullen Trades—Mr. Groeneveld, the AML Compliance Officer, and NSC's General Counsel.  *Id.* ¶¶ 272, 276, 278.  Ms. Johnson does not allege that, in conducting her confidential investigation, she shared with any of these three employees any concerns that the Mullen Trades were suspicious, much less unlawful.  Instead, Ms. Johnson alleges only that following her investigation, on March 8, 2019, she "verbally summarized" her team's findings to NFS Risk and that she and NFS Risk "remained concerned" due to what they perceived as the suspicious circumstances of the trade.  *Id.* ¶¶ 291-92.  Ms. Johnson does not, however, allege that when she

summarized the findings of her investigation to NFS Risk she reported to NFS Risk any concern of illegality.

Not until after Mr. Mullen had advised Ms. Johnson of her termination from employment did she report any alleged violation of the securities laws to the SEC.  In "March 2019," Ms. Johnson reported to the SEC's Office of the Whistleblower "the Mullen Trades, and Defendants' subsequent wrongful activity retaliating against and attempting to interfere with Ms. Johnson's compliance with the securities laws and regulations."  Am. Compl. ¶ 391.  Implicit in this allegation is Ms. Johnson's concession that she went to the SEC only after she had been advised of her termination of employment, an activity she alleges to be in retaliation of her investigation of the Mullen Trades.  Absent from the Amended Complaint, however, is any well-pleaded factual allegation that indicates that Mr. Mullen had any knowledge that Ms. Johnson undertook an investigation of the Mullen Trades.  Instead, Ms. Johnson simply speculates, upon only "information and belief," that Messrs. Groeneveld, Ortega, and Kageff "told Defendant Mullen that Ms. Johnson was investigating the Mullen Trades." *Id.* ¶¶ 404, 411.  Ms. Johnson provides no facts to support this conclusory allegation.  Ms. Johnson also does not allege anywhere in the Amended Complaint that Messrs. Groeneveld, Ortega, and Kageff knew about Mr. Mullen's intention to terminate Ms. Johnson's employment or that they impeded the investigation or told Mr. Mullen about the investigation to bring about Ms. Johnson's termination.

## IV.    Ms. Johnson's Derivative Claims and Failure to Make Demand on the Board

Despite the fact that she is suing National individually on multiple counts of wrongdoing, Ms. Johnson also purports to stand in the shoes of National to assert derivative claims on behalf of National against its board of directors (each a "Director" and, collectively, the "Directors" or the "Board").  She asserts that the Directors harmed National by entrusting the company to Mr.

Mullen (who she terms "unfit to lead"[5]), approving employment contracts for him and Mr. Worman, failing to stop Ms. Johnson's termination from taking effect or investigating Mr. Mullen's allegedly suspicious trading, and failing to implement internal controls. *See* Am. Compl. ¶¶ 372-80.

In making these claims, Ms. Johnson focuses on the alleged connections among National's officers and Directors on the one hand, and Fortress, Dr. Rosenwald, and Mr. Weiss on the other. Ms. Johnson alleges that Mr. Mullen and the Directors were beholden to Fortress and allowed National to become a victim of its "self-dealing schemes" rather than serving the interests of National and its shareholders. *See* Am. Compl. at p. 15, *see also id.* ¶¶ 376, 379-80. She alleges that as a result National suffered "damage to its stock price and market capitalization ...[,] corporate image and goodwill" and costs associated with unidentified government investigations. *See id.* ¶¶ 365, 382. She claims that all this supposed malfeasance by the Board caused damages to the company of at least "$15,000." *Id.*[6]

Before filing the Amended Complaint, Ms. Johnson did not make a demand upon the Board. Am. Compl. ¶ 341. In arguing that demand would have been futile, Ms. Johnson alleges in conclusory terms that the Directors are interested because they face a substantial likelihood of personal liability and that they lack independence because they are beholden to Mr. Mullen and because of their loyalty to Fortress, Dr. Rosenwald, and Mr. Weiss. *Id.* ¶¶ 341-52. As explained

---

[5] Am. Compl. ¶ 167. Ms. Johnson also engages in character assassination of Mr. Mullen by, for example, describing him as an "investment adviser with little managerial experience in his checkered career," *id.* ¶ 2, alleging that he regularly used "hideous and misogynistic phrases," *id.* ¶ 179, and "flouted securities laws and regulations," *id.* ¶ 172, and trying to prove his guilt by association with prior employers who experienced legal troubles after his departure, *id.* ¶¶ 139-40.

[6] Ms. Johnson does not make clear the basis for this number, whether it is significant in light of (for example) National's annual revenues, or why she included a number at all. Nor does she explain how Mr. Mullen or Fortress's involvement with National were responsible for the decline in the company's stock price.

below, none of these allegations comes close to the high threshold for pleading demand futility under applicable law.

## ARGUMENT

Defendants[7] move to dismiss Counts I and II (the "Derivative Claims") in full, as well as Counts III-VI and Count VIII in full (the "Retaliation Claims"). Defendants are not moving to dismiss Counts IX-XIII (the "Discrimination Claims") at this time and reserve all rights to challenge those claims in subsequent stages of this proceeding.

**I.      The Court Should Dismiss the Derivative Claims at Count I and II**

The Derivative Claims are legally insufficient for two equally compelling reasons.  <u>First</u>, Federal Rule of Civil Procedure 23.1 ("Rule 23.1") requires that Ms. Johnson be a fair and adequate representative of National's shareholders, but she is not.  <u>Second</u>, Ms. Johnson did not make a pre-suit demand on the Board, and she fails to plead that demand would have been futile.

**A.      Ms. Johnson Is an Improper Plaintiff Under Rule 23.1**

As a threshold matter, the Court should dismiss the Derivative Claims because as a matter of law, Ms. Johnson—who is suing National and related entities in her individual capacity on multiple counts of alleged wrongdoing—cannot also stand in National's shoes and prosecute causes of action belonging to National.[8]  Rule 23.1 states that a "derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or

---

[7] "Defendants," as used herein, consists of three corporate entities (NSC, NAM, and National) and eleven individuals (Mr. Mullen, Mr. Worman, Mr. Groeneveld, Mr. Ortega, Mr. Kageff, Mr. Singer, Mr. Hume, Mr. Gary, Mr. Fagenson, Mr. Michas, and Ms. Creagh).

[8] Courts dispose of derivative claims on motions to dismiss when the impropriety of the plaintiff is clear from the face of the complaint.  *See, e.g.*, *JFURTI, LLC v. Singal*, 2018 WL 6332907, at *14 (S.D.N.Y. Nov. 12, 2018) (granting motion to dismiss); *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 136 (S.D.N.Y. 1991) (same); *In re Bank of Am. Corp. Sec., Deriv. & ERISA Litig.*, 2010 WL 5248815, at *3 (S.D.N.Y. Dec. 14, 2010) (same); *Priestley v. Comrie*, 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2017) (same).

association."[9]  Because a derivative action binds nonparty shareholders, "fundamental considerations of fairness and justice demand that the representation be adequate," and the representation must "insure the vigorous prosecution of the claim."  *Papilsky v. Berndt*, 466 F.2d 251, 260 (2d Cir. 1972).  A plaintiff is inadequate to prosecute derivative claims when "interests which set the plaintiffs apart from the other shareholders will tend to cause them to disregard their interests."  *Bolton v. Gramlich*, 540 F. Supp. 822, 835 (S.D.N.Y. 1982).  Ms. Johnson obviously is not a proper plaintiff under this standard.

Courts in the Second Circuit have long applied a *per se* rule or strict standard against so-called "hybrid" actions, whereby a shareholder purports to bring derivative claims on behalf of the corporation and direct personal claims against the corporation in the same action, because such shareholders necessarily "face an impermissible conflict of interest."  *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 2006 WL 2849783, at *7 (S.D.N.Y. Oct. 4, 2006); *see also Tatintsian v. Vorotynstev*, 2018 WL 2324998, at *2 (S.D.N.Y. May 22, 2018); *Tuscano v. Tuscano*, 403 F. Supp. 2d 214, 223 (E.D.N.Y. 2005); *Ryan v. Aetna Life Ins. Co.*, 765 F. Supp. 133, 135 (S.D.N.Y. 1991).

Indeed, courts in this district have expressed deep concern with the "propriety" of allowing a plaintiff to "seek[] to recover personally against" a corporation while "simultaneously[] prosecuting a claim" on its behalf.  *Petersen v. Federated Dev. Co.*, 416 F. Supp. 466, 475 n.6 (S.D.N.Y. 1976); *see also Brickman v. Tyco Toys, Inc.*, 731 F. Supp. 101 (S.D.N.Y. 1990) (holding plaintiff inadequate).  Such plaintiffs purport to pursue two irreconcilable goals: replenishing the corporate coffers and recovering for themselves out of

---

[9] Because the issue of a plaintiff's adequacy under Rule 23.1 is procedural, rather than substantive, federal common law applies.  *See JFURTI*, 2018 WL 6332907, at *10.  Federal courts in this context routinely look to case law governing plaintiff adequacy for class actions for guidance.  *See, e.g., Papilsky v. Berndt*, 466 F.2d 251, 260 (2d Cir. 1972) (citing class action cases in a Rule 23.1 case); *JFURTI*, 2018 WL 6332907, at *11.

them.  That fundamental conflict infects every strategic decision in a "hybrid" case, particularly where both claims involve the same conduct.  As courts have observed, a plaintiff cannot vigorously pursue a claim that the corporation was harmed while also attempting to prove the corporation harmed the plaintiff by the same conduct.  *See, e.g.*, *In re Bank of Am. Corp. Sec. Deriv. & ERISA Litig.*, 2010 WL 5248815, at *2 (S.D.N.Y. Dec. 14, 2010) (noting that plaintiff's "success in prosecuting the ... [c]omplaint depends on establishing Bank of America's violations of the federal securities laws" while "in the derivative action, [plaintiff] must prove that Bank of America was injured ... during those same transactions").

These cases and their rationale apply with full force here.  Common sense dictates that Ms. Johnson cannot in good faith claim to represent the best interests of National and its shareholders with undivided loyalty, where her principal objective clearly is to recover money for herself against National and not to help National.  Indeed, that conflict of interest will be borne out in every strategic choice Ms. Johnson would have to make as a plaintiff attempting to prove that National was both the perpetrator and victim of the same alleged misconduct. *Compare* Am. Compl. ¶ 403 (alleging that National "aided and abetted" retaliation against Ms. Johnson in violation of the Dodd-Frank Act"), *with id.* ¶ 364 (alleging that "[t]he wrongful termination of Ms. Johnson's employment has already caused National significant harm").

Courts also have precluded direct plaintiffs from bringing derivative claims where (as here) the derivative claims seek substantially less in damages than the direct claims.  *See, e.g.*, *G.A. Enters., Inc. v. Leisure Living Communities, Inc.*, 517 F.2d 24, 26-27 (1st Cir. 1975) ("In these circumstances, the court could conclude that the dog might soon wag the tail.").  Indeed, where the plaintiff's stake in the derivative claim is "infinitesimally small," courts have expressed concern that the derivative claim could be misused as "leverage to obtain a favorable

settlement" on the direct claims. *Recchion ex rel. Westinghouse Elec. Corp. v. Kirby*,
637 F. Supp. 1309, 1315 (W.D. Pa. 1986) (quoting *Blum v. Morgan Guar. Tr. Co.*, 539 F.2d
1388, 1390 (5th Cir. 1976)); *see also Prime Mover Partners L.P. v. Elixir Gaming Techs., Inc.*,
898 F. Supp. 2d 673, 692 (S.D.N.Y. 2012), *aff'd*, 548 F. App'x 16 (2d Cir. 2013); *Priestley v.
Comrie*, 2007 WL 4208592, at *6 (S.D.N.Y. Nov. 27, 2017).  In *JFURTI LLC v. Singal*, for
instance, the court dismissed the derivative claims where it was "perfectly clear" that they were
just a "device to obtain leverage" over the defendants.  2018 WL 6332907, at *13 (S.D.N.Y.
Nov. 12, 2018).

That concern is also present here.  The derivative claims, by Ms. Johnson's own terms,
are a small tail wagging a large dog.  She puts a number of only $15,000 on her derivative
claims, despite their breadth.  Am. Compl. ¶¶ 365, 382.[10]  But on her direct individual claims,
Ms. Johnson seeks to recover millions of dollars of damages.  *E.g.*, *id.* ¶ 408.  The disparity
speaks for itself.

Accordingly, Ms. Johnson is not an adequate plaintiff under Rule 23.1 to bring the
Derivative Claims, and this Court should dismiss them with prejudice.[11]

## B.    Ms. Johnson's Failure to Make Demand Is Not Excused

Ms. Johnson's derivative claims fail for the independent reason that she made no demand
on the Board and has no excuse for not doing so.  Under Rule 23.1, to bring a derivative action, a

---

[10] To be sure, Ms. Johnson alleges that damages were "at least" that amount, but nonetheless, that is the only figure
that she identifies.  Am. Compl. ¶¶ 365, 382.

[11] Additionally, courts have blocked discharged former officers from undertaking derivative actions where they have
expressed acrimony toward the company that they seek to represent.  *See, e.g.*, *Khanna v. McMinn*, 2006 WL
1388744, at *42-44 (Del. Ch. May 9, 2006) (former general counsel engaged in an "acrimonious employment
dispute"); *Recchion*, 637 F. Supp. at 1312 (former employee alleged officers were engaged in self-dealing and
corporate waste).  Here, Ms. Johnson describes National's culture as "hostile," Am. Compl. ¶¶ 3, 174, alleges that it
"pigeonholed senior women," *id.* ¶ 190, and notes that she was terminated despite having been "devoted to National
for nearly two decades, often working during vacations," *id.* ¶ 89.  The Amended Complaint is laced with examples
of sarcasm and invective.  *See, e.g.*, *id.* ¶ 1 ("Michael Mullen mucked it up."); *id.* ¶ 3 ("'Boca Boys' cronies").  To
be clear, National disputes the accuracy of these allegations, but Ms. Johnson's animosity toward National is evident
on the face of the Amended Complaint.

plaintiff must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Similarly, under substantive Delaware law,[12] a plaintiff must make demand or plead with particularity the reasons for failing to do so.  *See Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000).  This pleading standard is "higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)."  *Fink v. Weill*, 2005 WL 2298224, at *3 (S.D.N.Y. Sept. 19, 2005).

Delaware law has two applicable tests for demand futility, both of which are arguably relevant here because Ms. Johnson challenges a mix of particular Board actions and an alleged course of conduct.[13]  Under *Aronson v. Lewis*, where a plaintiff challenges a particular board action, she must allege particularized facts creating a reasonable doubt that: "(1) the directors are disinterested and independent, [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment."  473 A.2d at 814.  The two prongs of *Aronson* are disjunctive.  *See Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).  Under *Rales v. Blasband*, where a plaintiff does not challenge a particular board action but rather a course of conduct or neglect (such as alleged failure to exercise oversight), "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt

---

[12] Unlike plaintiff adequacy, demand excusal is a substantive requirement governed by the law of the state of incorporation (here, Delaware).  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108-09 (1991); *Brody v. Chem. Bank*, 482 F.2d 1111, 1114 (2d Cir. 1973); *JFURTI*, 2018 WL 6332907, at *9.

[13] The Amended Complaint includes some allegations that appear to challenge a particular Board decision, such as approving Mr. Mullen as CEO and Chairman of the Board and offering new employment contracts to Mr. Mullen and Mr. Worman.  Am. Compl. ¶¶ 131, 320-23.  Other allegations challenge the Board's course of conduct.  *See, e.g., id.* ¶ 318 (Directors "knew of and / or consciously disregarded the Officer Defendants' violations of the securities and employment laws"); *id.* ¶ 325 (Directors "ignored Ms. Johnson's warning" about the allegedly suspicious Mullen Trades); *id.* ¶ 375 (Directors "engaged in a sustained and systemic failure to properly exercise their fiduciary duties"); *id.* ¶ 324 (Directors "allowed Ms. Johnson and her team to be fired").

that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand."  634 A.2d 927, 934 (Del. 1993).[14]

The ultimate question is the same: whether a majority of the Board can fairly evaluate the demand.  *See Guttman v. Huang*, 823 A.2d 492, 501 (Del. Ch. 2003) (citing *Rales*, 634 A.2d at 934) (observing that the "singular inquiry" in *Rales*—"'whether the board that would be addressing the demand can impartially consider its merits without being influenced by improper considerations'"—"makes germane all of the concerns relevant to both the first and second prongs of *Aronson*").  Thus, a "[p]laintiff must impugn the ability of at least half of the directors in office when it initiated th[e] action ... to have considered a demand impartially."  *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 57 (Del. Ch. 2015).  Analysis of whether a director is disinterested and independent is conducted on a director-by-director and claim-by-claim basis.  *See In re Cornerstone Theraps., Inc. S'holder Litig.*, 115 A.3d 1173, 1182 (Del. 2015).  Moreover, "[d]irectors are entitled to a *presumption* that they were faithful to their fiduciary duties.  In the context of presuit demand, the burden is upon the plaintiff in a derivative action to overcome that presumption."  *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048-49 (Del. 2004). Ms. Johnson does not come close to alleging demand futility under either *Aronson* or *Rales*.

---

[14] The Amended Complaint's demand futility allegations do not invoke the second prong of *Aronson* ("business judgment") with regard to any specific challenged Board action.  Ms. Johnson mentions "business judgment" only with regard to the Board's alleged failure to take action with regard to the Mullen Trades after receiving her report, but the second prong of *Aronson* does not apply to failure to take action.  *See Rales*, 634 A.2d at 933 ("The absence of board action, therefore, makes it impossible to perform the essential inquiry contemplated by Aronson—whether the directors have acted in conformity with the business judgment rule in approving the challenged transaction."); *In re INFOUSA, Inc. S'holder Litig.*, 953 A.2d 963, 986 (Del. Ch. 2007) ("The Court cannot address the business judgment of an action not taken and, therefore, should concern itself with what is now known as the *Rales* test."); Ralph C. Ferrara et al., Shareholder Derivative Litigation: Besieging the Board § 6.03[1] n.10 (2005).

1.    Ms. Johnson Has Not Adequately Alleged That a Majority of the Board
Faces a Substantial Likelihood of Personal Liability

To show that a director is interested, "the plaintiff must plead facts sufficient to show that

approval of the transaction was so 'egregious on its face that ... a substantial likelihood of

director liability exists.'" *Friedman v. Khosrowshahi*, 2014 WL 3519188, at *10 (Del. Ch. July

16, 2014), *aff'd*, 2015 WL 1001009 (Del. Mar. 6, 2015) (quoting *MCG Capital Corp. v. Maginn*,

2010 WL 1782271, at *18 (Del. Ch. May 5, 2010)).  The mere threat of personal liability is

insufficient.  *See Friedman*, 2014 WL 3519188, at *10 (citing *Aronson*, 473 A.2d at 815).  A

similar high standard applies to claims based on a course of conduct; Ms. Johnson must show

that the Board consciously disregarded its duties by ignoring "red flags."  *In re Goldman Sachs*

*Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *18-20 (Del. Ch. Oct. 12, 2011).

a)    National Exculpated Its Directors from Liability for Breach of
Their Duty of Care

As an initial matter, National has exculpated its Directors for breaches of fiduciary duties

pursuant to 8 Del. C. § 102(b)(7).  The exculpatory clause states that National's Directors "shall

not be personally liable to [National] or its stockholders for monetary damages for breach of

fiduciary duty," except in four circumstances: for (1) "any breach of the director's duty of

loyalty," (2) "acts or omissions not in good faith or which involve intentional misconduct or a

knowing violation of law," (3) improper distributions "under Section 174 of the DGCL," or (4)

"any transaction from which the director derived an improper personal benefit."  Amended &

Restated Certificate of Incorporation of National Holdings Corporation (Feb. 1, 2017).[15]

---

[15] Defendants have attached National's certificate as Exhibit 1 to the Declaration of Michael G. Bongiorno, filed
contemporaneously herewith.  Courts may properly consider exculpatory clauses in a corporation's articles of
incorporation on a motion to dismiss.  *See Malpiede v. Townson*, 780 A.2d 1075, 1091, 1093 n.61 (Del. 2001).

Where a corporation has exculpated its directors, "the risk of liability does not disable [the board] from considering a demand fairly unless particularized pleading permits the court to conclude that there is a substantial likelihood that their conduct falls outside the exemption." *In re Baxter Int'l, Inc. S'holders Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995). As a result, Ms. Johnson must "plead around" this exculpatory provision by asserting that the Directors breached their duty of loyalty, either by taking self-interested actions or by acting in bad faith, *i.e.*, in conscious disregard of their duties. *See Guttman*, 823 A.2d at 501. Ms. Johnson does not allege any self-interested actions and must therefore allege facts amounting to bad faith. That is, the Directors' conduct must involve conscious disregard of their duties and be "so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re Alloy, Inc.*, 2011 WL 4863716, at *7, *12 (Del. Ch. Oct. 13, 2011) (citation omitted).

> b) Ms. Johnson Alleges No Specific Wrongdoing by Any Director Amounting to Bad Faith[16]

Ms. Johnson asserts in conclusory fashion that the Directors face liability because the Board (1) approved employment decisions concerning certain Officer Defendants who were unqualified for their positions, (2) concealed the Officer Defendants' mismanagement, (3) were loyal to Fortress instead of National, (4) failed to implement or execute any internal controls, (5) ignored her warnings about the suspicious nature of the Mullen Trades and timing of her termination, and (6) failed to overturn her termination or increase her severance payment. *See* Am. Compl. ¶¶ 321-36, 343.

---

[16] For purposes of this Motion, Defendants assume the sufficiency of allegations as to Mr. Mullen, but will vigorously contest them should these counts proceed.

**Improper group allegations**.  As an initial matter, these assertions are flawed because Ms. Johnson makes the same conclusory allegations about the group of Directors as a whole and does not account for the fact that, given changes in Board composition over the relevant period, some of the Directors were not even on the Board when some of the underlying conduct took place and therefore could not conceivably be liable for it.[17]

Ms. Johnson alleges, for example, that the Board was loyal to Fortress instead of to National, and that this "disloyalty" has exposed National to "grave liability," Am. Compl. ¶ 327, and caused "underperform[ance] in the stock market" tracing back to 2016, *id.* ¶¶ 328-29.  But these allegations trace back to a time that pre-dates the tenure of several Board members.  Mr. Michas did not join the board until June 12, 2018.  *Id.* 59 n.5.  And Ms. Creagh and Mr. Gary joined the Board on February 13, 2019, *id.*, just after Fortress had sold its stake in National two days before, so they could not possibly have acted disloyally in favor of Fortress.  *Id.* ¶ 32 n.4.  Moreover, Mr. Fagenson was on National's Board before Fortress became a controlling shareholder, and in April 2012, Mr. Weiss lost his position on National's Board when Mr. Fagenson and three other non-parties invested $10 million in National.  These allegations directly contradict any notion that Mr. Fagenson was somehow loyal to Mr. Weiss, Dr. Rosenwald, or Fortress.  *Id.* ¶ 110.

**No specific allegations as to Board actions**.  Ms. Johnson merely lists the purportedly misguided employment decisions that the Board made (hiring Mr. Mullen, approving his and Mr. Worman's employment contracts in 2018), *see* Am. Compl. ¶¶ 320-23, and concludes that the Directors "rubber-stamp[ed] employment and promotions of unqualified Officer Defendants," *id.*

---

[17] Ms. Johnson  "alleges that each Director Defendant committed acts" constituting breaches of fiduciary duty at the times when each Director Defendant had such a duty.  Am. Compl. ¶ 59 n.5.  Apparently, Ms. Johnson would leave to the Court to determine which Director is potentially liable for each alleged breach of duty.  This is indicative of the slipshod nature of the Derivative Claims.

¶ 343. The Amended Complaint attempts to cast aspersions on Mr. Mullen's fitness for leadership by alleging that he has never held such responsibility previously, *id.* ¶¶ 133-35, that he was previously employed by firms that were subject to legal action after his departure, *id.* ¶¶ 139-60, and that his work at Opus Private and The Biotech Group was connected to Dr. Rosenwald and Mr. Weiss, *id.* ¶¶ 136-38, 162-63.  But these allegations are nothing more than a spurious and inflammatory attempt to suggest guilt by association.  For example, with respect to Mr. Mullen's prior employers, there are no facts suggesting he did anything wrong at any of those firms, was accused of any wrongdoing, or was involved in any of the malfeasance alleged by the government.  Indeed, if, as Ms. Johnson alleges, Mr. Mullen never had significant responsibility at those firms, it is even less likely that he was in a position to have participated in their allegedly illegal conduct.  And with respect to Mr. Mullen's alleged connection to Dr. Rosenwald and Mr. Weiss, that does not come close to showing that hiring him (or renewing his contract) amounted to bad faith by the Board, particularly where (*see infra* at p. 19-21) Ms. Johnson identifies no specific harm to National that eventuated from that connection.  Only in extreme circumstances can a Board be liable for hiring an executive; such a decision is the essence of business judgment.  *See, e.g.*, *In re Walt Disney Co. Deriv. Litig.*, 825 A.2d 275, 288-89 (Del. Ch. 2003) (finding that where complaint alleged specific facts detailing the deficiencies in directors' evaluation of executive's hire and departure, including spending less than one hour considering the possible hire, failing to ask for or review employment terms, and failing to ask for meeting to discuss departure, this amounted to "ostrich-like approach" indicating conscious and intentional disregard for duties).[18]

---

[18] A fortiori, Ms. Johnson offers no specific facts that could conceivably show the Board's renewal of Mr. Worman's contract was bad faith, or so egregious as to violate business judgment.

**No specifics as to alleged failure of oversight**.  Ms. Johnson also alleges that the Directors failed to exercise their oversight responsibility.  *See* Am. Compl. ¶¶ 318, 360.  But this theory "is possibly the most difficult theory in corporat[e] law upon which a plaintiff might hope to win a judgment."  *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).  Ms. Johnson must establish not only a "sustained or systematic failure of the board to exercise oversight," but also that "the directors knew that they were not discharging their fiduciary obligations ... demonstrating a conscious disregard for their responsibilities."  *Stone ex rel. AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370, 372 (Del. 2006); *see also In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).  Here, too, conclusory allegations are insufficient; a complaint must identify specific "red flags" that came to the Directors' attention which they ignored.  *See Guttman*, 823 A.2d at 506, 507 n.36.[19]

As to Ms. Johnson's allegation that the Board failed properly to consider her report about the allegedly suspicious nature of the Mullen Trades, *see* Am. Compl. ¶ 352, that is flatly contradicted by the fact that the Board hired outside legal counsel after meeting with her, *see id.*  In any event, without more, "bald charges of mere failure to take corrective action" are inadequate to show demand futility.  *Lewis v. Graces*, 701 F.2d 245, 249 (2d Cir. 1983), *abrogated on other grounds by Espinoza ex rel. JPMorgan Chase & Co. v. Dimon*, 797 F.3d 229 (2d Cir. 2015).  And the Board was entitled to rely on the conclusions of Messrs. Kageff, Ortega,

---

[19] Ms. Johnson also alleges that several Directors were members of various Board committees.  Am. Compl. ¶¶ 47, 53-54, 59.  Without more, mere allegations of committee membership are insufficient to show a substantial likelihood of personal liability.  *See In re CNET Networks, Inc. S'holder Deriv. Litig.*, 483 F. Supp. 2d 947, 963 (N.D. Cal. 2007) (applying Delaware law); *see also La. Mun. Police Emps. Ret. Sys. v. Pandit*, 2009 WL 2902587, at *12 (S.D.N.Y. Sept. 10, 2009).

and Groeneveld that the Mullen Trades involved no wrongdoing.  *See* Del. Gen. Corp.

Law § 141(e).[20]

Ms. Johnson also complains that the Directors "allowed [Plaintiff] and her team to be

fired" and "failed to even offer her an appropriate severance package."  Am. Compl. ¶¶ 324,

352.[21]  But the Board owed no fiduciary duty to Ms. Johnson as an employee.  *See Byington v.*

*Vega Biotechs., Inc.*, 869 F. Supp. 338, 345 (D. Md. 1994) (applying Delaware law).  Its failure

to intervene in her employment could only subject the Directors to liability if it somehow

involved a breach of duty to National, and Ms. Johnson offers no allegations remotely suggesting

the Board acted in bad faith by deferring to management on what were surely quintessential

management decisions, namely whether to terminate employees and how much severance

to pay them.

Ms. Johnson concludes that the Directors "conceal[ed] the pattern of mismanagement and

securities violations by the Officer Defendants," Am. Compl. ¶ 343, and failed to implement

internal controls, *id.*  Again, however, she fails to identify any "red flags" or other concrete facts

showing that any Director was aware of, much less concealed, such misconduct.  *See Guttman*,

823 A.2d at 506, 507 n.36 (complaint must identify specific red flags that directors ignored);

*Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1288 (Del. 1994) (unsupported

allegations of knowing or deliberate action are insufficient to deny defendants protection of

exculpation provision).  As to "controls," Ms. Johnson fails to specify what controls the Board

---

[20] Even if this "failure" were somehow subject to prong two of *Aronson*, the Amended Complaint's self-serving allegations do not remotely approach the gross negligence that would be necessary to establish a breach of business judgment.  *See Aronson*, 473 A.2d at 812.

[21] As noted above, this failure to act also is subject to *Rales* not *Aronson*, but in any case, Ms. Johnson alleges no facts suggesting the Board's failure to reverse an employment decision by management somehow breached its business judgment.

failed to implement, so it appears to be a purely circular allegation:  Mr. Mullen allegedly

mismanaged the Company, so there must have been inadequate controls.[22]

     Ms. Johnson also alleges that the Board was loyal to Fortress instead of to National, and

that this "disloyalty" exposed National to "grave liability" and caused "underperform[ance] in

the stock market" tracing back to 2016.  Am. Compl. ¶¶ 327-29.  But even leaving aside fatal

timing problems as to several Directors, *see supra* at 14 & n.7, these allegations once again are at

a high level of generality and offer no specifics connecting Fortress's involvement with the

alleged harms to National, much less "red flags" that came to the Board's attention in that regard.

The Amended Complaint does assert that Fortress "installed its subordinates" as officers and

directors of National, *id.* ¶¶ 127-28, but that of course is what controlling shareholders do, and is

not a "red flag."

     Ms. Johnson claims broadly that the Board failed in its oversight duties by allowing Mr.

Mullen to allegedly mismanage the company.  In support of this claim, Ms. Johnson alleges that

Mr. Mullen received ten times the compensation from his commissions at Opus Private as from

his base salary at National, Am. Compl. ¶¶ 168-71, that he failed (along with Messrs. Worman

and Groeneveld) to act upon learning that the Firm Trading Supervisor falsified documents to

internal audit, *id.* ¶ 173, and that he created a hostile work environment, *id.* ¶¶ 174-91.  Other

than conclusions and rhetoric, Ms. Johnson fails to explain how any of these actions caused

damage to National, fails to identify a single specific action where Mr. Mullen favored Fortress's

interests over National's, and fails to identify a single red flag that came to the Board's attention

with regard to Mr. Mullen's purported disloyalty, much less one  that it ignored.  And although

---

[22] As evidenced by the multiple levels of review of the Mullen Trades, National clearly had controls with respect to executives' securities transactions.  *See* Am. Compl. ¶¶ 236, 242-44.

Ms. Johnson self-servingly argues that her termination by Messrs. Mullen and Worman[23] injured National, she does not explain how.  For example, no facts are alleged showing any harm to National resulting from the "multiple significant regulatory investigations" pending at the time of her termination.  *Id.* ¶ 335.

Ms. Johnson is left to claim implausibly that Mr. Mullen's affiliation with Fortress and alleged mismanagement drove down National's stock price over the course of his tenure, but all she can cite over a several year period is a single 5% drop on the day Reuters published an article about Fortress and National, Am. Compl. ¶ 331, while the stock price chart she includes shows that the price also rose steeply at times. The Court can take notice that stock price movements are a highly complex phenomenon, and it is absurd to suggest that National's stock price somehow put the Board on notice that Mr. Mullen was mismanaging the Company.

    2.    <u>Ms. Johnson Has Not Adequately Alleged That a Majority of The Directors Lack Independence</u>

Ms. Johnson equally fails to rebut the presumption that the Directors are independent, offering only conclusory wholesale allegations.[24]  Delaware law asks whether a director is "beholden to [an interested director] for his livelihood or a material portion of his income," *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 602 (S.D.N.Y. 2007), or otherwise "dominated" or "controlled" by an interested director, *In re Dow Chem. Co. Deriv. Litig.*, 2010 WL 66769, at *7-8 (Del. Ch. Jan. 11, 2010) ("[W]ithout an interested director the independence of the remaining directors need not be examined.") (citing *Brehm*, 746 A.2d at 258), or has a

---

[23] The extent to which Mr. Worman was involved in her termination is unclear.  The Amended Complaint contradicts itself in multiple places regarding whether Mr. Worman's role or lack thereof.  For example, although Ms. Johnson alleges that he terminated her to prevent her from completing or reporting on her investigation, Am. Compl. ¶¶ 205, 299, 351, elsewhere she states that Mr. Worman did not know about her termination until the morning it happened, *id.* ¶¶ 206, 301, and made no substantive remarks at the meeting, *id.* ¶ 303.

[24] The Amended Complaint also ignores National's statement in a February 25, 2019 Form DEF 14A Proxy Statement that Mr. Hume, Mr. Michas, Ms. Creagh, and Mr. Gary—a Board majority—qualified as independent directors under NASDAQ Rule 5605(a)(2).

personal relationship with an interested director such that she would breach her fiduciary duties rather than risk the relationship, *Beam*, 845 A.2d at 1052.  Even assuming for purposes of this Motion that Mr. Mullen is an interested Director, the Amended Complaint is devoid of allegations indicating that any Director is beholden to Mr. Mullen, or dominated or controlled by him, or has a disabling personal relationship with him.[25]

Ms. Johnson also relies on the notion that the Directors are disabled from fairly evaluating demand by their alleged loyalty to Fortress, Dr. Rosenwald, and Mr. Weiss.  This is completely irrelevant.  Although courts may also consider whether a director is beholden to a controlling shareholder as well as to an interested director under some circumstances, *see, e.g.*, *In re Western Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *11 (Del. Ch. May 22, 2000), here, Fortress was not a controlling shareholder at the time either the original or Amended Complaint was filed.  Am. Compl. ¶ 32.  Rather, it sold its stake in February 2019.  And even more importantly, neither Fortress nor Dr. Rosenwald was ever named as a defendant in this action, and Mr. Weiss was dismissed voluntarily in response to a Rule 11 letter.[26]  Therefore, whatever the Directors' relationship to Fortress, Dr. Rosenwald, and Mr. Weiss, it could not have precluded them from impartially considering a demand.  *See, e.g.*, *Park Emps.' & Ret. Bd. Emps.' Annuity & Benefit Fund v. Smith*, 2017 WL 1382597, at *7 (Del. Ch. Apr. 18, 2017) (finding alleged link between director and non-party insufficient to show director was interested or lacked independence).

In any event, Ms. Johnson's allegations about the Directors' alleged ties to Fortress, Mr. Rosenwald, and Mr. Weiss are insufficiently particularized to show lack of independence.  For

---

[25] Whether Mr. Mullen himself is "beholden" to anyone, see Am. Compl. ¶¶ 167-93, is irrelevant because he is only one of seven directors and a majority must be disabled from fairly evaluating demand.
[26] *See* Notice of Voluntary Dismissal Pursuant to FRCP 41(a)(1)(A)(i) [ECF No. 65].

example, she concludes that each Director is beholden to them "for their lucrative directorships and other relationships with other Fortress Entities." Am. Compl. ¶¶ 345, 348. But "[t]ypically, compensation or benefits do not render a director interested or remove that director's independence unless they are unusually lavish or extreme." *Chrystall v. Serden Techs.*, 913 F. Supp. 2d 1341, 1353 (S.D. Fla. 2012) (applying Delaware law) (citing *King v. Baldino*, 648 F. Supp. 2d 609, 618-19 (D. Del. 2009)); *see also Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) ("The fact of compensation, even from both a parent and a subsidiary company, is not enough."); *In re Sagent Tech., Inc. Deriv. Litig.*, 278 F. Supp. 2d 1079, 1089 (N.D. Cal. 2003). Moreover, "[f]or director compensation to create independence problems, ... it must be shown that the compensation is material to the director." *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) (citing *Orman v. Cullman*, 794 A.2d 5, 25 n.50 (Del. Ch. 2002)). Ms. Johnson does not offer any facts showing that either of these circumstances applies to any Director.[27]

Ms. Johnson's conclusory allegations as to "relationships" and "personal [] ties", Am. Compl. ¶¶ 345, 348, are similarly insufficient. Allegations showing "a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence." *Beam*, 845 A.2d at 1050. The relevant test is whether a director "would be more willing to risk his or her reputation than risk the relationship with the interested [person]." *Id.* at 1052. Ms. Johnson does not identify a single specific connection between Mr. Michas, Ms. Creagh, or Mr. Gary and either Fortress, Dr. Rosenwald, or Mr. Weiss. And other than the

---

[27] In several instances, Ms. Johnson bases her allegations that the Directors serve Fortress, Dr. Rosenwald, and Mr. Weiss upon "information and belief." Am. Compl. ¶¶ 319, 348. At least one court has held such allegations insufficient in a related demand futility analysis under Delaware law, named whether (under the interestedness prong) the challenged transactions were the product of reasoned business judgment. *See Innovative Therapies, Inc. v. Meents*, 2013 WL 2919983, at *6 (D. Md. June 12, 2013) (stating that "[i]t simply is not enough to allege, in a conclusory manner and only upon information and belief," that the challenged transactions were not the result of the directors' business judgment).

apparent circular suggestion that Messrs. Singer and Fagenson must be loyal to Fortress because Fortress was at one time a controlling shareholder of National, there are no facts remotely demonstrating either man would disregard his duties to National due to such alleged loyalty.[28]

Ms. Johnson alleges that Mr. Hume lacks independence because he is a director of Fortress-related entity TGTX, Am. Compl. ¶ 47, but again such an outside relationship, without more, is inadequate to show lack of independence.  *See Beam*, 845 A.2d at 1050.  Similarly, the mere fact that Mr. Hume was appointed to National's Board by Fortress, Am. Compl. ¶ 127, "should not, without additional evidence, automatically foreclose a director's potential independence."  *In re W. Nat'l Corp.*, 2000 WL 710192, at \*15 (citing *Aronson*, 473 A.2d at 815).  Finally, that Mr. Hume graduated from the same college and law school as Mr. Weiss, *see* Am. Compl. ¶¶ 50-51, is plainly insufficient to introduce any doubt about Mr. Hume's independence.  *See Beam*, 845 A.2d at 1050.

In short, Ms. Johnson has not adequately alleged that a majority of the Board are interested in this litigation or lack independence, and accordingly this Court should dismiss the Derivative Claims for failure to make demand.

## II.    The Court Should Dismiss In Full the Retaliation Claims at Counts III-VI and Count VIII

### A.    Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  As the Second Circuit further explained, "although 'a court must accept as true all of the allegations contained in a

---

[28] Indeed, with respect to Mr. Fagenson, as noted above at *supra* p. 16-17, this suggestion is directly contradicted by the Amended Complaint, Am. Compl. ¶ 110.

complaint,' that 'tenet' 'is inapplicable to legal conclusions' and '[t]hreadbare recitals of the elements of a cause of action, unsupported by mere conclusory statements, do not suffice.'"  *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009).  Further, "'only a complaint that states a *plausibl*e claim for relief survives a motion to dismiss', and '[d]etermining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id.* (emphasis added).

> **B.      The Court Should Dismiss Count III Because Ms. Johnson Fails to Allege Facts Sufficient to Set Forth a *Prima Facie* Case of Retaliation Under the Sarbanes-Oxley Act**

Ms. Johnson cannot maintain her claim against any of the named Defendants for retaliation in violation of the Sarbanes-Oxley Act (or "SOX") because she has failed to allege the first two elements of a *prima facie* case for such a claim.  To set forth a *prima facie* case under the Sarbanes-Oxley Act's anti-retaliation provisions, 18 U.S.C. § 1514A, Ms. Johnson must allege that: (i) she engaged in protected activity; (ii) the employer knew that she engaged in the protected activity; (iii) she suffered an unfavorable personnel action; and (iv) the protected activity was a contributing factor in the unfavorable action.  *See* 29 C.F.R. § 1980.104(e)(2); *Bechtel v. Admin. Review Bd., U.S. Dep't of Labor*, 710 F.3d 443, 447 (2d Cir. 2013).  Nowhere in the Amended Complaint does Ms. Johnson plead (nor could she) that either (i) she engaged in "protected activity" or (ii) that her employer *knew* she engaged in protected activity.

> 1.      Ms. Johnson Fails to Plead that She Engaged in Protected Activity

Ms. Johnson has failed to plead any facts that she engaged in protected activity.  A plaintiff's activity is only "protected" pursuant to Section 1514A(a)(1) if the plaintiff "provide[s] information … or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of ... any rule or regulation of the Securities and Exchange Commission ... when the information or assistance is provided to or the

investigation is conducted by" (a) a federal agency, (b) Congress, or (c) "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)."  18 U.S.C. § 1514A(a)(1). Because Ms. Johnson pleads neither (i) that she provided information about conduct she believed to constitute a violation of the securities laws, nor (ii) that she provided any such information to a person with supervisory authority over her or the authority to investigate misconduct, she cannot maintain that she engaged in protected activity.  *See id.*

Ms. Johnson alleges that, in February 2019, NFS—a wholly-owned subsidiary of Fidelity that NSC engaged to serve as a clearing firm—asked her "*confidentially*" and **"*discreetly*"** to investigate the Mullen Trades and "to report back to NFS Risk without Defendant Mullen or others at National becoming aware of [NFS Risk's] investigation."  Am. Compl. ¶¶ 11, 221-22, 228, 269.  Ms. Johnson further alleges that she later spoke to Mr. Groeneveld, the AML Compliance Officer, and NSC's General Counsel about the Mullen Trades and how they had initially been approved.  *Id.* ¶¶ 272-79.  Nowhere in the Amended Complaint does Ms. Johnson plead either (i) that she told any of these three individuals that she had any belief that the Mullen Trades constituted a violation of the securities laws[29] (to the contrary, Ms. Johnson pled how she was instructed "confidentially" and "discreetly" to "investigate the Mullen Trades," *id.* ¶¶ 11, 228, and does not plead that she broke that confidentiality), or (ii) that any of the individuals with whom she discussed the Mullen Trades was a person with supervisory authority over her (or was an individual who had the authority to investigate misconduct and was someone she sought

---

[29] Nor could Ms. Johnson, as Chief Compliance Officer, establish "protected activity" for simply doing her job—in this case investigating a trade, a very commonplace occurrence.  *See Andrews v. ING N. Am. Inc. Corp.*, ALJ Case Nos. 2005-SOX-50, 2005-SOX- 51 (ALJ Jan. 8, 2009) (holding that chief information security officer whose job was to report issues and concerns with the network did not engage in protected activity by performing his assigned duties); *Riddle v. First Tenn. Bank*, 2011 WL 4348298, at *8 (M.D. Tenn. Sept. 16, 2011) ("To establish protected activity, plaintiff is required to step outside his role and take additional action.")*, aff'd*, 497 F. App'x 588 (6th Cir. 2012).

to undertake an investigation).  Indeed, the Amended Complaint makes clear that Ms. Johnson was the individual with the authority to investigate (and charged with investigating) the propriety of the Mullen Trades, and that she spoke to the three individuals about the Mullen Trades only to gather facts as part of *her* investigation to *determine* whether the Mullen Trades may have violated the securities laws.  In this way, Ms. Johnson admits in the Amended Complaint that she did not share with others her concerns that the Mullen Trades may have been unlawful[30] and she therefore has failed to plead that she engaged in protected activity.  *See, e.g.*, *Kantin v. Metro. Life Ins. Co.*, 2016 WL 1020988, at *3 (S.D.N.Y. Mar. 14, 2016) ("A whistleblower must state *particular concerns* which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." (emphasis added)), *aff'd in part*, 696 F. App'x 527 (2d Cir. 2017); *Fraser v. Fid. Tr. Co. Int'l*, 2005 U.S. Dist. LEXIS 48059, at *25-26 (S.D.N.Y. June 23, 2005) ("In order for the whistleblower to be protected by SOX, the reported information must have a certain degree of specificity and must state *particular concerns* which, at the very least, reasonably identify a respondent's conduct that the complainant believes to be illegal." (emphasis added) (internal citations omitted)), *aff'd*, 396 F. App'x 734 (2d Cir. 2010).  Ms. Johnson therefore cannot maintain the first element of a *prima facie* case under the Sarbanes-Oxley Act's anti-retaliation provisions and Count III must for this reason be dismissed.[31]

2.     Ms. Johnson Fails to Plead that Her Employer Knew She Engaged in Protected Activity

Even assuming, *arguendo*, that Ms. Johnson had sufficiently pled that she engaged in protected activity, her claim would still be subject to dismissal because she has failed to plead

---

[30] Indeed, Ms. Johnson does not even allege that she reported concern of illegality to NFS Risk when she summarized to them the findings of her investigation.  *See* Am. Compl. ¶¶ 291-92.

[31] As detailed in Section III below, Ms. Johnson also failed to plead that she reported any alleged violations of the securities laws to the SEC before she was advised of her termination from employment, and she therefore cannot maintain that she engaged in any such protected conduct under Section 1514A(a)(1)(A).

facts sufficient to show the second element of a *prima facie* case under Section 1514A—that the employer *knew* that she engaged in protected activity.  To allege knowledge under the second element of the *prima facie* case, Ms. Johnson must plead facts asserting that those involved in her adverse employment action had knowledge of her protected activity.  *See Wiest v. Lynch*, 15 F. Supp. 3d 543, 566 (E.D. Pa. 2014) (finding the knowledge prong of Section 1514A *prima facie* test to "only make sense when read to require that those involved in the adverse employment action have knowledge of the protected activity"); *see also Frederickson v. Home Depot USA, Inc.*, 2010 DOL Ad. Rev. Bd. LEXIS 77, at *18-19 (Dep't of Labor May 27, 2010) (dismissing plaintiff's claim under Section 1514A, because none of the management officials involved in or responsible for the plaintiff's termination had any knowledge of his alleged protected activity, an essential element of this claim).

The sole attempt that Ms. Johnson makes to plead Mr. Mullen's knowledge is her allegation, made "*upon information and belief*," that Messrs. Groeneveld, Ortega, and Kageff "told Defendant Mullen that Ms. Johnson was investigating the Mullen Trades."  Am. Compl. ¶ 411.  Even if the statement about Ms. Johnson's investigation constituted a reference to her protected activity (which for the reasons set forth above it does not), this bare, conclusory allegation unsupported by any specific factual allegation is legally insufficient to satisfy the knowledge element of a *prima facie* case under Section 1514A.  *See Boyd v. Accuray, Inc.*, 873 F. Supp. 2d 1156, 1170-71 (N.D. Cal. 2012) (holding that knowledge element not satisfied where plaintiff stated, without support, only that "[c]learly, the persons involved in the decisionmaking process ... were all made aware in one way or another of these complaints"), *aff'd*, 593 F. App'x 647 (9th Cir. 2015); *Wiest*, 15 F. Supp. 3d at 565-66 (dismissing plaintiff's Sarbanes-Oxley retaliation claim where "all that the plaintiff can allege is knowledge of the

protected activity on the part of certain higher-ups who may or may not have been involved in the adverse action"); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal citations omitted)).  For this reason as well, Count III must be dismissed.

C.     **The Court Should Dismiss Count IV Because Ms. Johnson Is Not a "Whistleblower" Under Dodd-Frank's Anti-Retaliation Provision**

Ms. Johnson cannot maintain her claim against any of the named Defendants for retaliation in violation of the Dodd-Frank Act because she is not a "whistleblower" as defined by Dodd-Frank's anti-retaliation provision (15 U.S.C. § 78u-6(h)).  In the seminal decision of *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 757 (2018), the United States Supreme Court held that an employee who did not alert the SEC of suspected securities-law violations by his company before his termination was not a whistleblower under Section 78u-6(h) and therefore was unable to sue under Dodd-Frank's anti-retaliation provision.  Relying on the explicit definition of a "whistleblower" set forth in Section 78u-6(a)(6), which "means any individual who provides … information relating to a violation of the securities laws *to the Commission*" (emphasis added), the Supreme Court ruled that "an individual who falls outside the protected category of 'whistleblowers' is ineligible to seek redress under the statute, regardless of the conduct in which that individual engages."  *Id*. at 777.  Because the plaintiff in *Digital Realty* failed to provide information "to the Commission" before his termination of employment, "he did not qualify as a 'whistleblower' at the time of the alleged retaliation.  He is therefore ineligible to seek relief under § 78u-6(h)."  *Id.* at 778.

Count IV of the Amended Complaint must be dismissed because, like the plaintiff in *Digital Realty*, Ms. Johnson does not qualify as a "whistleblower" eligible to seek relief under Dodd-Frank's anti-retaliation provision.  Nowhere in the Amended Complaint does Ms. Johnson plead that she reported any alleged violation of the securities laws to the SEC before she was advised of her termination from employment.  Although Ms. Johnson tries to obscure this fact by failing to include in the Amended Complaint the precise date in March on which she provided information to the SEC, her narrative establishes that she did not contact the SEC *before* she was told of her termination.  As Ms. Johnson alleges in Count IV of the Amended Complaint: "Defendants Mullen and Worman terminated Ms. Johnson's employment ... in order to punish [her] from complying with the securities laws and *in anticipation of* her reporting those violations to the SEC." (emphasis added).  Am. Compl. ¶¶ 396-97.  By accusing the Defendants of terminating her employment "in anticipation" of her reporting violations to the SEC, Ms. Johnson concedes that she had not yet provided any information to the SEC when advised of her termination.  She again concedes the same later in Count IV, when she alleges: "In March 2019, Ms. Johnson reported the Mullen Trades, and Defendants' subsequent wrongful activity retaliating against [her] … to the SEC's Office of the Whistleblower."  *Id.* ¶ 399.  Implicit in this statement is Ms. Johnson's admission that she had already been advised of her termination from employment when she made her report to the SEC.

Because Ms. Johnson fails to allege that she reported any information to the SEC before being advised of her termination from employment (and in fact repeatedly alleges that she reported information to the SEC only after being told of her termination), she does not qualify as a "whistleblower" under Dodd-Frank's anti-retaliation provision and she is therefore ineligible to maintain her claim. *See Digital Realty*, 138 S. Ct. at 778; *see also Rollins v. Goldman Sachs &*

*Co. LLC*, 2019 WL 2754635, at *7 n.3 (S.D.N.Y. July 2, 2019) (holding that the plaintiff was

"not entitled to protection by the anti-retaliation provisions because he was terminated before he

reported to the SEC"); *Tellez v. OTG Interactive, LLC*, 2019 WL 2343202, at *4 (S.D.N.Y. June

3, 2019) (where this court dismissed a Dodd-Frank claim because plaintiff "did not provide any

information ... to the [SEC]").  Count IV must therefore be dismissed in its entirety.

> **D.**    **The Court Should Dismiss Counts V and VI Because Ms. Johnson Cannot State a Claim for Aiding and Abetting Retaliation Under the Dodd-Frank Act or the Sarbanes-Oxley Act**
>
> > 1.    Ms. Johnson's Inability to Maintain an Underlying Cause of Action for Retaliation under the Dodd-Frank Act or the Sarbanes-Oxley Act Precludes Her from Maintaining Aiding and Abetting Claims Under Such Laws

An aiding and abetting claim cannot survive if the underlying cause of action has been

dismissed.  *See, e.g.*, *Kittay v. Atl. Bank (In re Glob. Serv. Grp. LLC)*, 316 B.R. 451, 462 (Bankr.

S.D.N.Y. 2004) ("Without a primary violation, there is no wrongdoing to aid and abet.");

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 196

(S.D.N.Y. 2011) ("Accordingly, the breach of fiduciary duty claim against SPS is dismissed.

Absent that underlying breach, claims against the SPS Affiliates for aiding and abetting that

breach must be dismissed as well.").  Because Ms. Johnson cannot, for the reasons set forth in

Sections B and C, maintain her claims under the anti-retaliation provisions of the Sarbanes-

Oxley Act or the Dodd-Frank Act (collectively the "Anti-Retaliation Provisions"), she cannot

maintain her claims alleging that certain Defendants aided and abetted violation of the Anti-

Retaliation Provisions.  Counts V and VI must therefore be dismissed in their entirety.

     2.     <u>Even if Ms. Johnson Could Maintain Her Underlying Causes of Action</u>
<u>Under the Anti-Retaliation Provisions, the Court Should Still Dismiss Counts V</u>
<u>and VI Because No Cause of Action for Aiding and Abetting the Anti-Retaliation</u>
<u>Provisions Exists</u>

Even assuming, *arguendo*, that Ms. Johnson was able to maintain her underlying claims

alleging violation of the Anti-Retaliation Provisions, Counts V and VI for "aiding and abetting"

would still be subject to dismissal because no such causes of action exist under law.  Although

certain sections of the Sarbanes-Oxley Act and the Dodd-Frank Act explicitly provide for aiding

and abetting liability, neither of the Anti-Retaliation Provisions does so.  This glaring absence

indicates Congress' decision not to impose aiding and abetting liability under the Anti-

Retaliation Provisions.  *See Central Bank of Denver, N.A. v. First Interstate Bank*, 511 U.S. 164,

182-84 (1994) (holding that "when Congress enacts a statute under which a person may sue and

recover damages from a private defendant ... there is no general presumption that the plaintiff

may also sue aiders and abettors" and finding that "[t]he fact that Congress chose to impose

some forms of secondary liability, but not others, indicates a deliberate congressional choice

with which the courts should not interfere").  Just as the Supreme Court held in *Central Bank*

that "it is not plausible to interpret the statutory silence as tantamount to an implicit

congressional intent to impose § 10(b) aiding and abetting liability," *id.* at 185, this Court must

hold that courts cannot plausibly interpret the Anti-Retaliation Provisions' statutory silence as

tantamount to an implicit congressional intent to impose aiding and abetting liability under such

provisions.  The court should therefore dismiss Counts V and VI for failing to state a claim.

     3.     <u>Even if Aiding and Abetting Causes of Action Existed Under the Anti-</u>
<u>Retaliation Provisions, Counts V and VI Would Still Be Subject to Dismissal</u>
<u>Because Ms. Johnson Failed to Plead Substantial Assistance</u>

Even assuming, *arguendo*, that the Anti-Retaliation Provisions permitted aiding and

abetting claims to be brought thereunder (and that Ms. Johnson could maintain her underlying

claims alleging violation of the Anti-Retaliation Provisions), Counts V and VI would still be subject to dismissal.  Ms. Johnson has failed to plead a necessary element of any aiding and abetting claim: that a named defendant has provided substantial assistance in the commission of the underlying tort.

To assert a claim for aiding and abetting a civil tort, a plaintiff must plead: "(1) the existence of an underlying tort; (2) defendant's actual knowledge of the underlying tort; and (3) defendant's provision of substantial assistance in the commission of the underlying tort." *In re Bayou Hedge Funds Inv. Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007).  The third prong of an aiding and abetting *prima facie* case—defendant's provision of substantial assistance— requires "that the plaintiff allege that the acts of the aider and abettor proximately caused the harm upon which the primary liability is predicated."  *Ritchie Capital Mgmt., L.L.C. v. Gen. Elec. Capital Corp.*, 121 F. Supp. 3d 321, 338 (S.D.N.Y. 2015) (citation omitted).  This proximate causation requirement means that a plaintiff must plead that a named defendant affirmatively acted in a manner that enables the underlying wrong to occur to allege substantial assistance.  *See Nigerian Nat'l Petrol. Corp. v. Citibank, N.A.*, 1999 WL 558141, at *8 (S.D.N.Y. July 30, 1999) ("A defendant provides substantial assistance only if it 'affirmatively assists, helps conceal, or by virtue of failing to act when required to do so *enables the [tort] to proceed*.'" (emphasis added) (citation omitted)); *Krys v. Sugrue (In re Refco Inc.)*, 2011 U.S. Dist. LEXIS 142291, at *55 (S.D.N.Y. Dec. 8, 2011) ("In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated.  The Plaintiffs must allege more than but-for causation.  They must allege also that their injury was a direct or reasonably foreseeable result of the conduct." (citation omitted)).

The "underlying tort" in this case is the alleged termination of Ms. Johnson's employment in violation of the Anti-Retaliation Provisions.  However, nowhere in the Amended Complaint does Ms. Johnson assert (nor can she) that any of the Defendants named in Counts V and VI knew about or were in any way involved in the decision to terminate her employment, let alone that any of them provided "substantial assistance" in bringing about or executing such action.

Paragraphs 404 and 411 of the Amended Complaint, using identical language, assert that Messrs. Groeneveld, Ortega, and Kageff "worked to facilitate and bury Defendant Mullen's suspicious trading ... impeded Ms. Johnson's investigation of the Mullen Trades and, upon information and belief, told Defendant Mullen that Ms. Johnson was investigating the Mullen Trades."  None of these allegations, however, pertains to the alleged underlying tort of Ms. Johnson's termination in violation of the Anti-Retaliation Provisions:  Nowhere does Ms. Johnson allege that any of these named Defendants *knew* about Mr. Mullen's intention to terminate her employment, that they impeded the investigation, or that they told Mr. Mullen about the investigation to bring about her termination.  Ms. Johnson therefore has failed to allege that any of the named Defendants provided substantial assistance in terminating her employment in violation of the Anti-Retaliation Provisions.  *See Ritchie Capital Mgmt.*, 121 F. Supp. 3d at 338; *Citibank*, 1999 WL 558141, at *8; *Krys*, 2011 U.S. Dist. LEXIS 142291, at *55.

Similarly, Amended Complaint paragraphs 406 and 413 allege, using identical language, that "Defendants Worman[32], Hume, Gary, Fagenson, Michas, and Creagh all aided and abetted the wrongful termination by refusing to intercede or take any action after Ms. Johnson informed them of the Mullen Trades and the other illicit activity surrounding Defendants Mullen's and

---

[32] It appears that reference to Mr. Worman was accidental, as he is named in the underlying cause of action in Count IV and is not referenced in the Count V or VI headers.

Worman's announcement that her employment would be terminated." This allegation again fails to plead substantial assistance in bringing about or executing Ms. Johnson's termination, as the named Defendants are accused only of having failed to act *after the decision to terminate had already been made*.[33] This allegation of inaction after the underlying tort had already occurred is insufficient as a matter of law, as the named Defendants cannot be found to have proximately caused a harm that had already occurred by the time they learned of it.[34]

Ms. Johnson's failure to plead any facts indicating that any of the Defendants named in Counts V or VI provided substantial assistance in terminating her employment in violation of the Anti-Retaliation Provisions requires that both of these Counts be dismissed.

### 4.   In No Event Can Ms. Johnson Maintain Claims Under the Sarbanes-Oxley Act Against the Named Directors or John Does 1-10

In addition to the foregoing reasons for dismissal, Ms. Johnson's claims in Count VI against Messrs. Hume, Gary, Fagenson and Michas, Ms. Creagh, and John Does 1-10 are subject to dismissal because the anti-retaliation provisions of the Sarbanes-Oxley Act do not give rise to claims against any of them. Section 1514A expressly identifies which categories of persons may be liable for retaliation. *See Zornoza v. Terraform Glob., Inc.*, 2019 WL 6701875, at *11 (S.D.N.Y. Dec. 9. 2019). These categories consist only of a "company ... or any officer, employee, contractor, subcontractor, or agent of such company ...." 18 U.S.C. § 1514A(a). Directors are not included in the list of persons liable for retaliation under Section 1514A, and recent case law from the Southern District of New York has explicitly held that "the plain text of section 1514A does not provide for director liability." *Id.* at *12. As a result, to the extent

---

[33] Ms. Johnson does not try to plead any involvement, let alone substantial assistance by, named Defendants National or John Does 1-10.

[34] Moreover, as noted above, *supra* Section I.B.1.a, Ms. Johnson has failed to plead sufficient facts indicating that any Director acted in bad faith, as required to overcome National's exculpation clause.

Count VI is asserted against Messrs. Hume, Gary, Fagenson and Michas, and Ms. Creagh, each of whom Ms. Johnson pleads in the Amended Complaint to be only a director of National, the Count must be dismissed against each of them.  For an analogous reason, Count VI must be dismissed against John Does 1-10, a category of defendant who also is omitted from the list of persons liable for retaliation under Section 1514A(a).

> 5.      In No Event Can Ms. Johnson Maintain Claims Against Defendants Groeneveld, Ortega, Kageff, or Singer Under the Sarbanes-Oxley Act or the Dodd-Frank Act Because Each Lacks the Functional Ability to Retaliate Against Her

In addition to the foregoing reasons for dismissal, Ms. Johnson's claims in Count V and VI against Messrs. Groeneveld, Ortega, Kageff, and Singer are subject to immediate dismissal because nowhere in the Amended Complaint has she alleged that any of them has supervisory authority over her, let alone the functional ability to retaliate against her.  *See Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, 2009 WL 2844805, at *6-8 (Dep't of Labor Aug. 31, 2009) (dismissing plaintiff's Sarbanes-Oxley retaliation claim because the defendant "was not a decision maker in the termination of Klopfenstein's employment"); *Jordan v. Sprint Nextel Corp.*, 3 F. Supp. 3d 917, 932 (D. Kan. 2014) ("Plaintiff fails to state a [SOX retaliation] claim against Defendant Forsee because there are no allegations that Forsee personally undertook any actions against Plaintiff."); *Bury v. Force Prot., Inc.*, 2011 WL 2935916, at *2 (D.S.C. June 27, 2011) (dismissing retaliation claim because "nowhere in his one hundred forty (140) page Complaint does Plaintiff set forth any factual allegations to show that either [named defendant] was in any way involved in the decision to not promote or fire him.").

**E.     The Court Should Dismiss Count VIII Because New York Does Not Recognize a Claim for Civil Conspiracy and Ms. Johnson Failed to Plead a Necessary Element of a Civil Conspiracy Claim Under Washington Law**

　　　1.     New York Does Not Recognize Civil Conspiracy as an Independent Cause of Action

As an initial matter, to the extent that Count VIII of the Amended Complaint attempts to set forth a cause of action under New York law for civil conspiracy, it must be dismissed for failure to state a claim.  No independent tort exists under New York law for civil conspiracy. "New York [] does not recognize civil conspiracy as an independent tort; such a claim stands or falls with the underlying tort."  *Berwick v. New Work Network Int'l, Ltd.*, 2007 WL 949767, at *6 (S.D.N.Y. Mar. 28, 2007) (citation omitted)).  *See also Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 369 (S.D.N.Y. 2009) ("Civil conspiracy is not an independent tort in New York, and this claim is therefore dismissed."); *Kinojuz I.P. v. IRP Int'l Inc.*, 2016 WL 5936875, at *7 (E.D.N.Y. Oct. 12, 2016) ("The claim for civil conspiracy is dismissed as civil conspiracy is not an independent tort under New York law.").  Therefore, Ms. Johnson cannot maintain the Count VIII cause of action under New York law and it is subject to dismissal.

　　　2.     Ms. Johnson Failed to Plead a Necessary Element of a Civil Conspiracy Claim Under Washington Law

Ms. Johnson's cause of action for civil conspiracy is also subject to dismissal under the laws of the State of Washington because Ms. Johnson has failed to plead facts sufficient to maintain such a claim.  Under Washington law, a claim for civil conspiracy requires that a plaintiff prove "that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means, and (2) the conspirators entered into an agreement to accomplish the conspiracy."  *Woody v. Stapp*, 189 P.3d 807, 810 (Wash. Ct. App. 2008).  In addition, Washington courts have held that "civil conspiracy is not, by itself, an actionable claim.  The plaintiff must be able to show an underlying actionable claim which was

38

accomplished by the conspiracy for the civil claim of conspiracy to be valid." *Webster v. Webster*, 2012 WL 628228, at *5 (Wash. Ct. App. Feb. 28, 2012).

Even if Ms. Johnson could show an underlying actionable claim (which, for the reasons set forth above, she cannot), her allegations in support of her conspiracy claim are woefully inadequate. Ms. Johnson's assertion in Count VIII (that all of the named Defendants "were aware that the decision to terminate Ms. Johnson's employment was wrongful, but they facilitated it anyway," Am. Compl. ¶ 426) is not only conclusory, but fails even to suggest the existence of an agreement. This assertion indicates nothing more than each named Defendant played an individual role in facilitating the alleged wrongdoing; it does not imply any agreement among the named Defendants.

Ms. Johnson's assertions in Paragraphs 427 and 429 also are insufficient. Her allegation fails to plead facts sufficient to show an agreement among conspirators because none of these allegations pertains to the alleged wrongful termination: nowhere does she allege that any of these named Defendants *knew* about an intention wrongly to terminate her employment, let alone that any of them entered into an agreement to accomplish such a wrongful termination.

Similarly, Paragraph 429 fails to plead an agreement to accomplish the conspiracy, as Ms. Johnson accuses the named Defendants only of having failed to act *after the decision to terminate had already been made*. For these reasons, the Court should dismiss Count VIII of the Amended Complaint.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Derivative Claims and the Retaliation Claims in full. Defendants are not moving at this time against the Discrimination Claims or Count VII. If the Motion is granted, the only remaining defendants would be NSC,

NAM, Mullen, and Worman, all of whom strenuously dispute the factual allegations in the

Amended Complaint and intend to illustrate their falsity after this Motion is decided.


Dated: March 18, 2020                                       Respectfully submitted,

                                                           /s/ *Michael G. Bongiorno*
                                                           Michael G. Bongiorno
                                                           Andrew Goldman
                                                           WILMER CUTLER PICKERING
                                                           HALE AND DORR LLP
                                                           7 World Trade Center
                                                           250 Greenwich Street
                                                           New York, NY 10007
                                                           Tel: (212) 230-8800
                                                           Fax: (212) 230-8888
                                                           michael.bongiorno@wilmerhale.com
                                                           andrew.goldman@wilmerhale.com

                                                           /s/ *Jonathan D. Rosenfeld*
                                                           Jonathan D. Rosenfeld
                                                           WILMER CUTLER PICKERING
                                                           HALE AND DORR LLP
                                                           60 State Street
                                                           Boston, MA 02109
                                                           Tel: (617) 526-6000
                                                           Fax: (617) 526-5000
                                                           jonathan.rosenfeld@wilmerhale.com

                                                           *Counsel for Defendants and Nominal
                                                           Defendant*